Bennett LEVIN

v.

Howard N. GARFINKLE, Barbara Garfinkle, Asher Fensterheim, Cyrus West, K. B. Weissman, Edward Breger, Norman Septimus, Jack Deutschmann, Huckleberry Farm, Inc., Haw Corporation, Tafu Corporation, Czar Realty Corporation.

Bennett LEVIN

v.

RONDI RIVER REALTY CORPORATION.

Civ. A. Nos. 77–3211, 78–3271.

United States District Court, E. D. Pennsylvania.

June 11, 1980.

Patrick T. Ryan, Mark M. Wilcox, Philadelphia, Pa., for plaintiff.

Jerome J. Shestack, David Smith, Philadelphia, Pa., for defendants.

Harry A. Rutenberg, Philadelphia, Pa., for defendant Weissman.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

Beginning in 1975, plaintiff Bennett Levin and defendant Howard Garfinkle participated in a series of complicated real estate ventures involving substantial amounts of money. Levin at first held a minority interest in a variety of properties owned by corporations controlled by Garfinkle, but later purchased Garfinkle's interest in seven large apartment complexes in Charlotte, North Carolina, giving, as part of the purchase price, a sizeable blanket mortgage (deed of trust) to Garfinkle. In October, 1976, Garfinkle alleged that Levin was in default on the mortgage. Rather than risk foreclosure, Levin authorized Garfinkle to sell the properties, both to satisfy Levin's debt as well as to realize a profit for Levin from appreciation of the properties. When the last property had been sold, the Garfinkle interests asserted that Levin still owed them a sizeable sum on his indebtedness to them, while Levin asserted that the defendants had conspired to defraud him in both the purchase and sale of the Charlotte properties, and in several other real estate ventures.

In this suit plaintiff seeks to recover compensatory and punitive damages for fraud, misrepresentation, conversion, and breach of fiduciary duty. He also seeks an accounting for the proceeds from various transactions which he alleges the Garfinkle interests diverted to their use without giving him credit against his indebtedness.

The matter was tried over several days from January 7–22, 1980. Testimony comprising over 2,000 pages of transcript was heard, and the parties submitted close to 400 exhibits. Thereafter, the parties submitted requests for findings of fact and conclusions of law, together with briefs on the legal issues. On pleadings, proof, and the written submissions of the parties, I make the following

## FINDINGS OF FACT

### A. *The Parties*

1. Plaintiff Bennett Levin is a professional engineer whose practice is conducted through several corporations. He has performed engineering services in a variety of real estate projects for major builders, although prior to his ventures with defendants he had never invested in real estate.

2. Defendant Howard Garfinkle's principal occupation is investing in real estate, which he pursues by investing his own capital through corporations which he controls, and by creating partnerships and syndications in which he participates.

3. Defendant Barbara Garfinkle is Howard Garfinkle's wife.

4. Defendant Asher Fensterheim is a member of the New York Bar, and in effect serves as Garfinkle's in-house attorney. He acts as an officer and director of various corporations controlled by Garfinkle, and generally receives a share in the ownership of Garfinkle ventures.

5. Defendant Cyrus West is a Garfinkle employee who handled disbursements and kept financial records for a number of Garfinkle corporations.

6. Defendant K. B. Weissman is a New York financier who has a long-standing business relationship with Howard Garfinkle, and who lent money to both Garfinkle and Levin to finance their various investments.

7. Defendant Edward Breger is a member of the New York Bar in private practice, whose specialty is real estate closings. He represented both Howard Garfinkle and

Bennett Levin in connection with some of the properties they owned.

8. Defendant Norman Septimus is an accountant who performed services for one of Levin and Garfinkle's joint ventures.

9. Defendant Jack Deutschmann was a Garfinkle employee and investor in several Garfinkle real estate ventures.

10. Defendant Huckleberry Farm, Inc. is Garfinkle's horse farm and personal residence in Albany, New York.

11. Defendants HAW Corporation, TAFU Corporation, and Czar Realty Corporation are all corporations which the parties have stipulated are controlled by Howard Garfinkle (P–364).

12. Defendant Rondi River Realty Corporation is a corporation formed by Howard Garfinkle to hold title to a New York property which he owned jointly with Bennett Levin. The parties have stipulated that this corporation is under the control of Howard Garfinkle.[1]

### B. Initial Dealings Between Levin and Garfinkle

13. Levin met Garfinkle in June, 1973, (T. 442) and performed professional engineering services for him in 1973 and 1974. (T. 34). He visited Garfinkle at his home in Florida, at which time he learned that Garfinkle was involved in some controversy over his business dealings, and had previously been convicted of criminal charges in connection with one of his ventures. (T. 442–446).

14. In February, 1975, Garfinkle filed for bankruptcy, at which time Levin entered a claim for approximately $700,000 for engineering services he had performed for Garfinkle. (T. 448–449).

15. To compensate Levin for his services, Garfinkle offered Levin the opportunity to invest $60,000 in a limited partnership, in which Levin would be given a participating share sufficient to cover Garfinkle's pre-bankruptcy debt to him. (T. 37–38).

16. The limited partnership was never formed, so Garfinkle then offered Levin the opportunity to invest in various real estate ventures. Levin accepted and invested in various properties in which he received an equity share of twenty to fifty percent. (T. 40).

### C. Purchase and Operation of the Charlotte Properties by Levin and Garfinkle Jointly

17. Between late 1975 and early 1976, Levin and Garfinkle purchased seven large garden-apartment complexes in Charlotte, North Carolina (the Charlotte Properties), in which Garfinkle interests held a seventy-five percent share, and Levin held a twenty-five percent share. Levin paid more than $100,000 to purchase his share. (T. 455).

18. Each of the seven properties had a development name, which in every case but one was changed by the Garfinkle interests when they bought the properties:

| | |
|---|---|
| Chatham Square | formerly Idlewild |
| Sheffield Farms | formerly Hope Valley |
| Timberline | formerly Countryside |
| Greenhouse | formerly Briarcreek |
| Cobblestones | formerly East Forrest |
| Hunt Club | formerly Hunter Oaks |
| Southgate | which remained the same. |

19. At the time the properties were purchased, both parties knew that existing mortgages on all of the properties were seriously in default. (T. 459). The purchase seemed advisable, however, because the price per apartment was substantially below the prevailing market replacement cost for similar units. (T. 460).

20. After purchasing the properties, both Levin and Garfinkle received detailed reports about problems with the physical condition of some of the units and the vacancy rate. (T. 475–495).

21. In December, 1975, Daryl Greenberg was hired to manage the Charlotte proper-

---

1. Rondi River Realty Corporation is the defendant in Civil Action No. 78–3271, a derivative action brought by Bennett Levin as a shareholder in the corporation. No. 78–3271 has been consolidated with Levin's overall case against the defendants because the basic issue is the same—whether the Garfinkle interests defrauded Levin.

ties. (T. 1471). Although Greenberg was the on-site manager, the rent receipts were forwarded to Garfinkle's office in New York, and Garfinkle's employees there disbursed the funds to pay vendors and mortgage lenders. (T. 1474, 1479).

22. In January, 1976, vendors began receiving bad checks from the Garfinkle office. (T. 1474–75). Greenberg kept a ledger of these checks. (P–70). In late January and early February, mortgage holders began to call Greenberg in North Carolina to complain about failures to meet mortgage payments. (T. 1479).

23. In March, 1976, Greenberg sought Levin's help in securing payment for vendors and mortgage lenders, and Levin was successful in making arrangements with them for paying the bills. (T. 1482–85).

24. In April, 1976, it was agreed by the parties that Levin should assume management of the Charlotte properties. He borrowed $350,000 from Continental Bank (T. 496), and upgraded computer facilities in his Philadelphia office to facilitate rent collection. (T. 426). During April, 1976, Estelle (Sue) Manin, a Garfinkle employee, worked in Levin's Philadelphia office, to which rent receipts were directed, and from which disbursements were made.

25. Levin also opened two accounts for his signature with Continental Bank, in the names of Charlotte Acquisition Corporation, and Acquisition Management Corporation (T. 108–09), both of which were Garfinkle corporations. (P–364, ¶ 1).

26. To induce Continental to lend the $350,000 to Levin and to service the accounts, Garfinkle persuaded defendant K. B. Weissman to deposit $240,000 in time accounts at the bank.

27. For a period of time, all of the rents were flown directly to Levin's office in Philadelphia. Thereafter, Garfinkle directed that the rents be flown to his office in New York, ostensibly so that his office could make duplicate rent records. (T. 872). Garfinkle employees then deducted a portion of the rent, instructed the Garfinkle employee in Levin's office, Sue Manin, to record a lower rent figure than was actually received, and forwarded the balance to Levin's office. (T. 872–874).

28. In May, 1976, Garfinkle forged Levin's name to certain checks on the Continental accounts, overdrawing them in the amount of approximately $136,000. (T. 109; 875); (P–66). Subsequently, collection of the rents was transferred back to Garfinkle's New York office.

29. Shortly after Garfinkle overdrew Levin's account, K. B. Weissman withdrew the $240,000 he had deposited in Continental Bank and closed his account. (T. 110–111); (P–62).

30. By the end of June, 1976, Levin owed Continental Bank approximately $526,000 as a result of his borrowings and overdrafts. (T. 111).

31. In late spring, 1976, because of the bad checks issued to vendors, and because of complaints by tenants about fraudulent promotions and misapplied security deposits, the Charlotte properties came under investigation by local newspapers and television, as well as the Fraud Division of the Charlotte Police Department. (T. 111–112). In May, 1976, Levin read an article which had been published the previous November in *Florida Trend* magazine, revealing in detail Garfinkle's prior criminal record, his history of issuing bad checks, and a fraud investigation of him by the Securities and Exchange Commission. (T. 467–470).

32. Because of growing unfavorable publicity due to Garfinkle's reputation, irregularities in property management, and the series of bad checks issued to vendors, Garfinkle and Levin feared the collapse of the properties. (T. 1175). They were particularly concerned about a report that the *Charlotte Observer* was preparing a major expose on the properties. (T. 1487–1488).

33. Garfinkle warned Levin that there was a threat that the senior lienholders would foreclose because of various defaults and the unfavorable publicity, and proposed that Levin become the sole owner of the properties, thus removing the taint of Garfinkle's involvement. (T. 112). Levin agreed to purchase the properties.

### D. *Levin's Purchase of the Charlotte Properties*

34. Levin bought all seven Charlotte properties from Garfinkle in a series of transactions during June, 1976. (T. 113).

35. Levin paid approximately $50,000 in cash; transferred to Garfinkle ownership of his stock in various joint ventures with Garfinkle (worth an undetermined amount); and executed a note and purchase money mortgage[2] in the amount of $3,050,000 to a Garfinkle corporation. (T. 113); (D–3; D–8; D–9; D–10). Levin had no personal liability under the note. (T. 551).

36. The $3,050,000 figure for the purchase money mortgage was calculated by Garfinkle, based upon projected rental income from the properties. (T. 115).

37. In addition to the basic documents necessary to transfer title to the property, the parties executed a series of collateral agreements and instruments at the time of Levin's purchase of the Charlotte properties.

38. Levin and Garfinkle executed mutual releases, whereby each released, with some limited exceptions, any claim he might have against the other up to that time. (T. 579–581); (D–6; D–7).

39. Levin agreed to pay delinquent mortgage payments on some of the properties. (P–77). Garfinkle made oral representations to Levin from a sheet in Garfinkle's handwriting, (P–78), about the amounts past due on the various mortgages. (T. 119). Levin subsequently learned that Garfinkle understated the amounts overdue. See Findings 114, 220, *infra.*

40. Garfinkle agreed, subject to certain conditions, to indemnify Levin for any losses arising out of two real estate ventures known as Sutton at Collingswood, and Bromley Estates. (T. 575); (D–4).

41. Garfinkle agreed to give Levin a share of the proceeds from the sale of a Garfinkle property known as Tiffany Apartments, if Garfinkle consummated a pending sale of the property to Newton Heller, a prospective buyer. (T. 576); (D–5).

42. Garfinkle agreed to lend to Levin, or cause to be lent, by August 15, 1976, the sum of $100,000, repayable without interest one year after the date of making the loan. (T. 575); (D–5).

43. Levin executed a letter, dated June 29, 1976, to Czar Realty Corporation, a Garfinkle corporation, and Asher Fensterheim, in which he acknowledged that he was aware of Garfinkle's criminal record, and of certain improprieties in connection with the management of the Charlotte properties. These included: commingling of assets; improper record-keeping and accounting procedures; the issuance of bad checks; the draining of funds from the properties, without repayment, for the personal use of Garfinkle and his associates; the forging of Levin's name to checks by Garfinkle; substantial defaults on senior liens on the property; and litigation against the properties brought by creditors. Levin also acknowledged that he had investigated the purchase before taking title, and was represented by counsel throughout. (D–2).

44. Levin and his personal attorney, Howard Creskoff, discussed the June 29, 1976 letter[3] for almost one hour before Levin signed it. (T. 559). Levin was advised that the letter might work against his interests if a dispute arose with Garfinkle. (T. 1168). Levin signed the letter because he wanted to help Garfinkle, who was being investigated by the SEC; because Levin had already wired $115,000 to senior lien-holders on the properties to forestall threatened foreclosures; and because he was physically tired and wanted to bring the deal to a close. (T. 147).

---

2. Referred to by the parties as the "deed of trust," or the "blanket mortgage". Originally, the deed of trust was held by Charlotte Southgate, Inc. Subsequently, Garfinkle caused it to be assigned to TAFU Corporation, and then to HAW Corporation. Garfinkle controlled all of these entities. (P–364, ¶ 1).

3. Referred to by the parties as the June 29 "estoppel letter."

45. Although Levin objected to signing the June 29th estoppel letter, he admitted at trial that, as the letter avers, he knew all of the facts stated therein at the time he purchased the Charlotte properties from Garfinkle. (T. 552–559).

### E. Garfinkle's Oral Representations to Levin With Respect to the Sale

46. Garfinkle made a series of oral representations and promises to Levin at the time Levin purchased the Charlotte properties in June, 1976.

47. Garfinkle promised that he would assist Levin in syndicating one of the Charlotte properties immediately after Levin's purchase of them. (T. 142).

48. Garfinkle represented that he was about to close a deal for the sale of Rondi River, a Levin-Garfinkle venture in New York, from which Levin would obtain substantial working capital.

49. Levin also testified that Garfinkle promised to forbear collecting interest on the deed of trust for a period of time, (T–142), but there is insufficient evidence to establish that Garfinkle did anything more than give Levin general assurances not to worry about timely payments or possible default. In either case, Levin paid the interest when it came due without protest or request for forbearance. (T. 646–648).

50. None of these promises were put in writing, (T. 656), even though the agreement of sale for the properties contained an integration clause stating that no agreements between the parties existed outside of the written contract, (D–8, ¶ 25), and Levin's attorney Howard Creskoff was aware of the existence of the clause and its legal effect. (T. 1199–1200).

51. Levin admitted at trial that Garfinkle's oral promises to him at the time of the sale were not an important inducement leading him to purchase the properties. (T. 655).

### F. Performance of Garfinkle's Promise to Syndicate one of the Properties

52. When Levin sought Garfinkle's assistance in syndicating the Hope Valley property, (later known as Sheffield Farms), Garfinkle and Fensterheim demanded a $150,000 fee for separating the mortgage on this property from the overall $3,050,000 deed of trust. Levin paid $75,000 in cash, and the aggregate indebtedness under the overall deed of trust was increased to $3,125,000. (T. 152–153); (P–205).

53. Garfinkle and Fensterheim also required Levin to prepay one full year's interest on the deed of trust, approximately $56,000. (T. 153).

54. Garfinkle performed all of the mathematical calculations as to the price at which the syndication was to be offered, projected rates of return, and the like. (T. 150–151); (P–100; P–101).

55. Based upon Garfinkle's calculations, Levin offered shares in the syndication to potential investors. When he discovered that Garfinkle had seriously misrepresented rental income in the offering, he withdrew it and refunded the money to those who had already invested. (T. 151–152).

56. In spite of the failure of the syndication, Levin never received back from Garfinkle and Fensterheim the consideration he had paid for separating the mortgage on the property, or the amount he had paid as prepaid interest. (T. 153).

### G. The Predicted Sale of the Rondi River Property

57. Levin did not inquire of Garfinkle as to the likelihood that the Rondi River sale would occur immediately after his purchase of the Charlotte properties. (T. 652–653).

58. In fact, Rondi River was sold in September, 1976, (T. 111), although Levin did not learn of the sale until late October, at which time he was informed by a Garfinkle employee who knew that Levin was a part owner of the property. (T. 98–99). See Findings 276 to 281, infra.

### H. Garfinkle's Misrepresentation of Rental Income from the Properties

59. At the time Levin was negotiating to buy the Charlotte properties from Gar-

finkle, in late June, 1976, Garfinkle represented that the total rental income of the properties was increasing at the rate of $5,000 per month. (T. 142–143). He also showed Levin a rent projection, (P–76), indicating that Levin could expect to realize $311,000 in rents during the month of July, 1976, consisting of $281,000 in current rental payments, and $30,000 in advance rental and security deposits. (T. 115).

60. Rent rolls from the properties show that at the time Garfinkle was making these representations to Levin, the rents were in fact much lower. Gross collections for June, 1976, including advance rental and security deposits, amounted to $264,231.82. (P–76 D); (T. 1495; 1498). Collections for current rentals only totalled $240,085.21. (*Id.*)

61. According to Daryl Greenberg, manager of the Charlotte properties during the ownership of both Levin and Garfinkle, collections for current rentals in July, 1976, Levin's first month as owner, totalled approximately $243,000. (T. 1497).

62. Upon learning that July collections were not keeping pace with Garfinkle's projections, Levin telephoned Garfinkle in New York for an explanation. Garfinkle consulted his rent records on the properties, but a Garfinkle employee observed that the purported rent figures which he read to Levin over the phone were higher than the actual rent figures in the records before him. (T. 881–882).

63. Garfinkle made it a practice to keep duplicate records, one set of which accurately reflected the income and expenses of a property, and one set which presented the property in a more favorable light, used to attract investors. (T. 859–862).

I. *Dealings Between Levin and Garfinkle after Levin's Purchase of the Charlotte Properties*

64. Levin had the Charlotte properties appraised after he purchased them. (T. 600–601). On the basis of the appraisal, Levin concluded that he had made a good investment, (T. 597–598), and he caused a financial statement to be prepared showing his equity in the Charlotte properties to be $7,766,000. (D–63B).

65. During the month of July, 1976, Levin paid to Garfinkle or his interests a total of $80,496.44, (P–365, ¶ 1), an amount far in excess of his obligations under the deed of trust.

66. Levin and Fensterheim agreed that Levin owed the Garfinkle interests a total of $88,687.50 for the month of August, 1976, (P–103), and Levin paid to Garfinkle or his interests a total of $146,093. (P–365, ¶ 1); (P–346 A); (T. 165–174).

67. During August, Levin made the September payment on the deed of trust in advance, in order to help Garfinkle with a cash shortage. (T. 182–183). This payment created a cash shortage for Levin in mid–August, (T. 183), and Levin then turned to Garfinkle for a loan. Garfinkle sent Levin a check for $50,000, but the check was returned to Levin's bank unpaid, (P–108), (T. 186), resulting in a temporary freeze on all of Levin's accounts at Continental Bank (T. 187).

68. In September, to ease his continuing cash shortage, Levin sought a loan from defendant K. B. Weissman in the amount of $305,000 secured by the Charlotte properties. Weissman refused to close the loan when he learned that Levin had permitted back taxes and liens on the properties to accumulate. (T. 1047–1049).

69. Garfinkle offered to borrow $100,000 from Weissman, by pledging the mortgage on the Hope Valley property, and to use the proceeds of the loan to make mortgage payments to senior lienholders on the Charlotte properties on Levin's behalf, (T. 192–193), thus fulfilling Garfinkle's promise to lend Levin $100,000. (D–5). *See* Finding 42, *supra.*

70. Garfinkle also suggested that Levin travel to North Carolina to meet with the senior lienholders directly, and to negotiate payment schedules. (T. 193).

71. As a condition of Garfinkle's payment of the lienholders, Levin's attorney, Howard Creskoff, agreed to assume certain

duties with respect to the Charlotte properties. He agreed, *inter alia*, to set up a special account into which all rent receipts would be directed, and from which Creskoff would ensure all liens and bills were paid. (P–131).

72. On September 15, 1976, Garfinkle borrowed $125,000 from K. B. Weissman. He used all of the proceeds for his benefit. (P–123); (T. 201–202).

73. Levin proceeded to arrange accommodations with the senior lienholders in North Carolina, (T. 132), and to assure them that payment was forthcoming. Five days after Levin left for North Carolina, Garfinkle employees forwarded checks to the lienholders, drawn on a bank account which had been closed for over six months. (T. 201–203). *See* (P–160). There was no agreement between Levin and Garfinkle that Garfinkle was to forward bad checks in order to "buy time" with the senior lienholders. *See* (T. 1890).

74. On September 28, 1976, Levin executed an affidavit stating that he had extensive knowledge of Garfinkle's criminal record before investing with him, and that he had purchased the Charlotte properties because they were a good business investment. (D–25). At trial, Levin testified that he lied when he swore to this affidavit. (T. 667).

75. In October, 1976, Garfinkle was admitted to a hospital with purported heart ailments. (T. 207–208). While he was in the hospital, Levin sent Barbara Garfinkle a total of $9,000 so that she could meet living expenses. (T. 208); (P–365, ¶ 1).

### J. Levin's Alleged Default

76. In late October, 1976, Levin, at Garfinkle's urging, went to Europe for a vacation. (T. 212; 1063–1064). On October 26, 1976, while Levin was out of the country, his attorney, Howard Creskoff, received letters signed by Cyrus West, on behalf of TAFU Corporation, declaring the deed of trust in default, and accelerating the entire indebtedness. (T. 1062–1064).

77. Creskoff telephoned Garfinkle, who asserted that Levin had not made payments on the mortgage. (T. 1604). Shortly thereafter, Garfinkle sent Creskoff a letter detailing a series of defaults on Levin's part, such as failure to keep senior mortgages current, and changing payment schedules without TAFU Corporation's consent. (P–173).

78. Most of the defaults which Garfinkle identified in his letter to Creskoff involved problems with the property which had carried over from Garfinkle's ownership, which he had assured Levin he would assist in resolving, or defaults such as alterations in payment schedules for the senior mortgages, which had occurred with Garfinkle's knowledge and consent. (T. 1064–1065; 1069–1070).

79. When Creskoff threatened to fight the proposed foreclosure in the North Carolina courts, Garfinkle agreed to stop legal proceedings and meet with Levin and Creskoff in New York. (T. 1070–1071).

### K. The November 8, 1976, Agreement to Sell the Properties to Satisfy the Deed of Trust

80. On November 5, 1976, Levin, Creskoff, Garfinkle, Fensterheim, and Edward Breger met at Garfinkle's New York apartment.

81. Garfinkle outlined a plan whereby he would become Levin's agent to sell the properties, and, through a series of complicated agreements, split the proceeds with Levin, with Levin's share to be applied to reducing his indebtedness under the deed of trust.

82. Creskoff protested his inexperience in negotiating complex real estate transactions, (T. 1080), and Garfinkle suggested that Breger represent Levin. (*Id.*)

83. Levin, Creskoff, and Breger had lunch together, during which they discussed the details of Garfinkle's proposal. Neither Levin nor Creskoff knew that Garfinkle had given Breger an $88,000 interest in the deed of trust earlier that week. (P–176); (T. 225).

84. At the lunch meeting, Breger explained Garfinkle's proposal to Levin and Creskoff, and tried to persuade them that it was a reasonable one. (T. 222–224); (T. 1080–1083).

85. The agreement reached at the November 5, 1976 meeting, was set forth in the form of a letter agreement dated November 8, 1976. (P–178). Under the agreement, Garfinkle was to become Levin's agent, with absolute discretion to sell the properties on Levin's behalf. (P–178, p. 2, ¶ 1). Cash proceeds from the sales were to be split according to a formula set forth in the agreement, with Garfinkle entitled to priority to cash in some sales, and Levin in others. (P–178, p. 3). Purchase money mortgages received were to be held by Garfinkle or his interests, with Levin holding a forty percent junior interest in the mortgages. (Id.) Garfinkle was to hold Levin's junior share in the mortgages as collateral for Levin's indebtedness under the deed of trust. (P–178, p. 4).

86. Breger explained that it was necessary to have a junior/senior relationship in order to allow Garfinkle to foreclose speedily if one of the purchasers defaulted. He also explained the pledge of Levin's share in the mortgages as collateral as necessary for Garfinkle's protection against Levin's stripping the properties of rents during the period of the sale, and allowing senior lienholders to foreclose, thereby wiping out Garfinkle's interest. (T. 222–224; 1080–1081).

87. Garfinkle represented to Levin that he would earn a profit of one million dollars through the sales. The possibility that there might be a shortfall, such that Levin would remain indebted to Garfinkle under the deed of trust, was dismissed by Garfinkle as totally improbable. (T. 226). Garfinkle's "promise" of a large profit was not reduced to writing. (T. 1328).

88. All cash and deposits received by Garfinkle, as well as his share of the purchase money mortgages, were to be credited against Levin's indebtedness under the deed of trust. (P–178, p. 3, ¶ 1H, I, J).

89. As part of the November 8 agreement, Levin was given a credit of $150,000 against the deed of trust indebtedness for Garfinkle's misrepresentation of the rental income to Levin at the time he purchased the properties. (P–178, p. 6, ¶ C). See Findings 59–63, supra.

90. Levin and Garfinkle reserved the right to have an accounting between TAFU Corporation and Levin for payments up to that time, provided, however, that neither party would be entitled to more than $150,000 in credit. (P–178, p. 6, ¶ 4B).

91. Levin also acknowledged in the November 8 agreement that, during negotiations for his purchase of the Charlotte properties, during the unsuccessful syndication attempt, and during the negotiation of the November 8 agreement itself, he was represented by Howard Creskoff, and was not subjected to fraud, misrepresentation, or duress of any kind. (P–178, pp. 8–9).

92. In addition to the main agreement of November 8, 1976, the parties also executed three collateral documents.

93. Creskoff executed a letter acknowledging that he represented Levin at the time of the purchase of the Charlotte properties and during negotiation of the November 8 agreement. (D–31).

94. Levin executed a release relieving Garfinkle of his obligation to lend Levin $100,000. (D–29). See Finding 42, supra ; (D–5).

95. Garfinkle executed a letter acknowledging that Levin owned a twenty-five percent interest in the New York Rondi River venture, notwithstanding that stock certificates had never been issued to Levin for his share. (D–32).

96. Levin signed the November 8 agreement to avoid foreclosure by Garfinkle. However, other options were available to him. Through counsel retained in North Carolina, Levin and Creskoff learned that Levin could assert various defenses at any foreclosure proceeding instituted by Garfinkle; could seek an injunction against the foreclosure; and seek forebearance from senior lienholders while he litigated with Garfinkle. (T. 1311–1314).

97. Levin entered into the November 8 agreement because he concluded that it would be more advantageous to do so than to litigate with Garfinkle because by litigating they risked foreclosure by the senior lienholders on the property. (T. 1314). After making the agreement, Levin believed that he had reached a satisfactory solution to the disputes between himself and Garfinkle. (T. 1341–1342); (D–127, Tabs G and J).

### L. The January 14, 1977, Modification of the November 8 Agreement

98. The Charlotte properties were not sold immediately, with the result that Levin was once again facing a cash flow crisis. (T. 233–234; 240).

99. In accordance with the terms of the November 8 agreement, see Finding 90, supra, Levin sought an accounting from Garfinkle for payments Levin had made to TAFU Corporation or for Garfinkle's benefit in excess of Levin's obligations under the deed of trust. Levin estimated that he was entitled to $105,000 from the Garfinkle interests. (T. 240–241).

100. Garfinkle met with Levin in early January, 1977. He informed Levin that he was not in a position to make a cash settlement with him at that time, but that he would adjust the terms of the November 8 agreement in Levin's favor. (T. 241).

101. The parties executed a letter agreement dated January 14, 1977, whereby Garfinkle waived his right of priority to cash proceeds from the sales of the Charlotte properties, and Levin's share in any purchase money mortgages received was increased from forty to fifty percent. (P–294).

102. The January 14, 1977 agreement also states that an accounting between the parties had occurred and that as of December 31, 1976, by virtue of the agreement they had reached, no balance was due from Levin to TAFU Corporation, or from TAFU Corporation to Levin. (Id.)

103. Howard Creskoff represented Levin in the negotiation of the January 14 agreement, and understood that it ratified the November 8 agreement between the parties. (T. 1344–1345).

### M. The Sale of the Charlotte Properties

104. The seven apartment complexes were sold at various times between March 1, 1977, and July 29, 1977.

105. At each sale, in accordance with the November 8 and January 14 agreements, see Findings 80–102, supra, Garfinkle and Levin split the cash proceeds, and Levin assigned to HAW Corporation the purchase money mortgages received, with HAW Corporation in turn granting Levin a fifty percent junior participation in the mortgages.

106. Garfinkle agreed with Levin to assume fifty percent of the legal fees and brokerage commissions incurred in the sale of the properties. (T. 1664–1665; 1677).

107. At some of the closings, Levin and Garfinkle had serious disputes because of the amount of unpaid taxes or other liens on the properties. (T. 728).

108. Howard Creskoff attended six out of the seven closings, although Edward Breger was Levin's counsel of record in most of the transactions.

109. At each of the closings, Levin executed an account stated letter, acknowledging the amounts credited to him and to the Garfinkle interests respectively, and setting forth the balance of his indebtedness to Garfinkle under the deed of trust. Each letter also reconfirmed the November 8 and January 14 agreements. (P–206, pp. 1–7).

110. Levin was present at each closing when the proceeds of the sale were being distributed. Obligations of Levin such as liens and back taxes were satisfied out of the proceeds of the sale. Levin and Garfinkle then negotiated the figure to be inserted in the account stated letters as Levin's outstanding indebtedness under the deed of trust.

111. Because of the adjustments negotiated by Levin and Garfinkle, the amount of credit against his indebtedness Levin was given in the account stated letters is not consistent with the actual amounts received at the closings.

### 1) *Southgate Closing*

112. The first property sold was Southgate, on March 1, 1977.

113. At the time of the first sale, Levin's indebtedness under the deed of trust was $2,975,000.

114. During preparation for the transfer of title, the parties learned that a payment to one of the senior mortgage holders on the property, City Federal Savings and Loan, was past due. (T. 128). The bank had failed to discover the delinquency until the time of sale. Levin paid approximately $24,000 to the bank to satisfy the lien. See Finding 39, *supra*; (P–77).

115. At the time of the closing, K. B. Weissman was owed $165,705.61 on a second mortgage he held on the property. To satisfy this mortgage, Weissman was paid $45,705.61 in cash from the proceeds of the sale. In addition, a new note in the amount of $120,000 was created. The cash was paid from Levin's share of the proceeds. (T. 295–296).

116. On April 1, 1977, Levin forwarded a check to Weissman in the amount of $5,400 on account of the note. (P–363, ¶ A.38). On that same date, Garfinkle also forwarded a check to Weissman, on which was noted in Garfinkle's handwriting "5,000.00 amount Southgate 400 interest 4/1/77 Payment." (P–360).

117. At the Southgate closing, Levin brought with him a ledger of disbursements he had made for Garfinkle, (D–124), on which he made some calculations which correspond in part to the figures on the account stated letter he signed after the closing. The account stated letter signed by Levin after the Southgate closing reflects an arithmetical discrepancy of $60,000, in that, taking the cash and mortgages assigned to HAW Corporation into account, Levin's indebtedness under the deed of trust should have been reduced to $2,530,481, whereas the balance remaining in the letter is stated as $2,590,481. (P–206, p. 1); (T. 297; 1687). I find that the $60,000 adjustment was made as security for Levin's obligation under the $120,000 note to K. B. Weissman. (T. 1688).

118. Prior to the Southgate sale, the purchaser had paid deposits toward the sale price. On January 14, 1977, Garfinkle received $37,500 in deposits. (P–294). On February 7, 1977, Garfinkle received $50,000 in deposits. (P–365, ¶ 16). At settlement, $154,829 was paid to Garfinkle or his interests. (P–365, ¶ 18). Edward Breger, who disbursed the funds at the closing, also disbursed $4,000 to himself for attorney's fees. (P–365, ¶ 57b). One-half of this $4,000 was Garfinkle's obligation. See Finding 106, *supra*. Assuming there were no private adjustments between Levin and Garfinkle, the total credit due Levin at the Southgate closing was $244,329. Levin in fact was given credit for $168,173. (P–206, p. 1).

119. Garfinkle testified that only part of the deposit moneys that had been received up until March 1, 1977, were credited to that sale, and that $75,000, of which $37,500 was Garfinkle's share, was rolled over to a subsequent sale involving the same purchaser, in order to induce that purchaser to close the subsequent transaction. *See* (P–296). Assuming that this is true, there is nonetheless a discrepancy between the amounts actually received by Garfinkle at the time of the closing and the amount credited against Levin's indebtedness under the deed of trust.

### 2) *Hunt Club and Timberline*

120. The Hunt Club and Timberline sales were closed on April 1, 1977.

121. Garfinkle and Fensterheim purchased the Hunt Club and Timberline properties through corporate entities which they established for that purpose. (T. 1741–1742); (P–206A, 206B).

122. Fensterheim made an adjustment in the account stated letter for the Timberline property, which diminished Levin's credit in the amount of $15,136.52. (P–206, p. 2). Fensterheim testified that this adjustment represented a compromise of certain disputes between Levin and Garfinkle over amounts they owed to each other, and that he simply inserted the figure Levin and Garfinkle asked him to insert. (T.

1691–1963). I reject this testimony in light of Finding 123.

123. A document from Fensterheim's files (P–296) which I accept as reliable, reveals that Fensterheim himself made the calculations that resulted in the $15,136.52 deduction from Levin's credit in the account stated letter. The document reflects that he charged the full brokerage commission against Levin's share, notwithstanding Levin and Garfinkle's agreement to split brokerage fees. *See* Finding 106, *supra.*

124. Fensterheim's explanation that exhibit P–296 reflects an attempt by him to reconcile the account between the parties after the first four sales, (T. 1696), and does not represent calculations used to arrive at the balance in the Timberline letter, is rejected.

### 3) *Greenhouse*

125. The Greenhouse sale was also closed on April 1, 1977.

126. The purchaser of the Southgate property also purchased Greenhouse. Before the Greenhouse closing, Levin and Garfinkle received further deposit moneys from the purchaser. On March 11, 1977, Levin and Garfinkle each received $30,000 in deposits. (P–365, ¶ 19). On March 21, 1977, Breger received $75,000 in deposits, of which he distributed $52,187 to Garfinkle, and $22,812 to Levin. (P–346–c); (P–365, ¶ 20).

127. As of April 1, 1977, a total of $210,000 in deposits had not yet been accounted for as between the buyer of the properties, and the sellers, Levin and Garfinkle: $75,000 rolled over from the first sale, and $135,000 received in March. (T. 315).

128. Only $135,000 in deposits was credited toward the Greenhouse sale closed on April 1, 1977. (P–350). Accordingly, the $75,000 rolled over from the Southgate sale was still not accounted for as between the buyer and seller on that date.

129. At the closing, Breger disbursed $80,021 to Garfinkle or his interests. (P–365, ¶¶ 21, 23).

130. Levin testified that he and Garfinkle agreed at the closing to split a number of costs, and that Fensterheim listed the items to be split on a document, (P–301). (T. 322–326). Exhibit P–301 contains three columns, one with the initials HG, for Howard Garfinkle, one with the initials BL, for Bennett Levin, and one labeled "HG & BL." *Id.* The total of the liabilities in the joint column was $137,606, which, if split by Levin and Garfinkle, would result in an obligation of $68,803 to each. *See* (P–301).

131. Assuming there were no private adjustments between Levin and Garfinkle, the total credit due to Levin at the Greenhouse closing was $231,011, reflecting $80,021 in cash paid to the Garfinkle interests, $82,187 in deposits, and $68,803 in liabilities assumed by Garfinkle. Levin in fact was given credit for $142,056 at the Greenhouse closing. (P–206, p. 4).

132. At the Greenhouse closing, Breger also received $30,000 in deposit moneys on a future sale, of which he disbursed $15,000 to Garfinkle. (T. 1618); (P–287). These funds were not considered in calculating Levin's credit under the deed of trust at the Greenhouse closing. (P–365, ¶ 23).

### 4) *Chatham Square*

133. The Chatham Square sale was closed on May 19, 1977.

134. Prior to the sale, the parties received further deposit moneys. On April 14, 1977, Breger received $75,000 in deposits, and disbursed $37,500 each to Levin and Garfinkle. (P–365, ¶ 24). In late April and early May, Breger received $50,000 more in deposits, (P–365, ¶¶ 26–27), which he disbursed at Garfinkle's direction. (T. 1826–1828).

135. At the closing, Breger disbursed to Garfinkle $26,384 from the cash proceeds. (P–365, ¶ 28).

136. Breger also disbursed $4,000 to himself as a legal fee, (P–365, ¶ 61d), and $3,500 as a brokerage commission, (P–365, ¶ 61c). Garfinkle was obligated for one-half of these fees. *See* Finding 106, *supra.*

137. Assuming there were no private adjustments between Levin and Garfinkle, the total credit due to Levin at the Chatham

Square closing was $117,634, representing $26,384 in cash, $87,500 in deposits, and $3,750 in split obligations. Levin in fact was given credit for $75,000. (P–206, p. 5).

138. At the Chatham Square closing, after certain adjustments were made, the purchasers discovered that they lacked $32,000 in cash necessary to close the transaction. Rather than abandon the deal, the purchasers executed an additional note and mortgage in favor of HAW Corporation for $32,000. No part of this note was credited against Levin's indebtedness under the deed of trust, and no credit is reflected in the account stated letter executed at the Chatham Square closing. (T. 1678–1680). Levin was never given a share agreement reflecting his participation in this note. (T. 1717–1718).

139. Subsequently, Garfinkle and Fensterheim started foreclosure proceedings on the $32,000 note and mortgage without naming Levin as a party, as they were required to do by the general share agreement between the parties. See (P–178); (T. 1719–1720; 1724).

140. Garfinkle and Fensterheim abandoned their foreclosure attempts on the $32,000 mortgage because the obligor went bankrupt and senior lienholders liquidated all of the assets. (T. 1719).

### 5) Sheffield Farms

141. The Sheffield Farms sale was closed on May 25, 1977.

142. Garfinkle received a total of $11,750 in deposit money for the Sheffield Farms property. (P–365, ¶ 25).

143. At the closing, Breger disbursed $47,546 to Garfinkle or his interests. (P–365, ¶ 29).

144. Breger also disbursed $6,000 to himself as repayment of a loan from Breger to Garfinkle. (T. 378–383); (P–210); (P–346B).

145. Breger also paid $4,000 to himself for legal services, and $200 to the title clerk (P–365, ¶ 63d, 63f). One-half of both payments was Garfinkle's obligation. See Finding 106, supra.

146. Assuming there were no private adjustments between Levin and Garfinkle, the total credit due to Levin at the Sheffield Farms closing was $67,396, representing $47,546 in cash, an additional $6,000 paid for Garfinkle's obligation to Breger, $11,750 in deposits, and $2,100 in split obligations. Levin in fact was given credit for $33,250. (P–206, p. 6).

### 6) Cobblestones

147. The Cobblestones sale was closed on July 29, 1977.

148. Prior to the closing, Garfinkle received $5,087 in deposit moneys. (P–365, ¶ 30).

149. After the closing, Fensterheim disbursed $72,749 to Garfinkle or his interests. (P–365, ¶ 31).

150. Out of the proceeds of the sale, Fensterheim also paid $12,500 in brokerage fees (P–262), $6,250 of which was Garfinkle's obligation. See Finding 106, supra.

151. Assuming there were no private adjustments by Levin and Garfinkle, the total credit due to Levin at the Cobblestones closing was $84,087, representing $5,087 in deposits, $72,749 in cash, and $6,250 in split items. Levin in fact was given credit for $65,000. (P–206, p. 7).

152. Cobblestones was the last property sold. None of the account stated letters reflects that Levin was given credit for Garfinkle's share of the $75,000 in deposit moneys that were rolled over from one sale to another. See Findings 119, 127, 128, 137, 142, supra. Likewise, none of the account stated letters reflects that Levin was given credit for Garfinkle's share of the $30,000 in deposits received on April 1, 1977. See Finding 132, supra.

153. As part of the adjustments against Levin at the Cobblestones closing, $20,000 was deducted from his share to compensate the buyer of the Sheffield Farms property, Anthony Scioli, for damage to some of the units and missing appliances. (T. 417); (P–267). Scioli was never paid or given credit for this amount. (T. 1227; 1255).

154. Levin and Garfinkle had serious disputes at the Cobblestones closing. (T.

751). Levin had been unable to make payments to senior mortgage holders for three months prior to the closing. (T. 2217).

155. Numerous disbursements were made at the Cobblestones closing, which Levin authorized. (D–127, Tab S).

156. Levin and Garfinkle negotiated a number of items at the Cobblestones closing, with Garfinkle agreeing to assume one-half of some of the outstanding obligations. (P–266); (T. 411–418).

157. Levin brought to the closing a list of claims against Garfinkle (P–267), and added to the list the various adjustments made against Levin at the closing. The figure "$65,000", the same figure inserted in exhibit P–206, p. 7, as the credit due Levin, appears on exhibit P–267. It is not clear, however, whether the figure $65,000 was reached through calculations done by Levin and Garfinkle on exhibit P–267, as the defendants contend, or whether Levin simply listed it on the sheet with the other figures.

158. When Levin signed the account stated letter after the Cobblestones closing, it indicated that he had an indebtedness of $777,935.04 under the deed of trust. (P–206, p. 7). Levin discussed with Creskoff the advisability of signing the letter before doing so, (T. 735), and Creskoff advised him not to do so before a final accounting. (T. 1361).

159. Levin signed the account stated letter because HAW Corporation would not release its mortgage unless he did so, (T. 765), and because he was afraid that if the sale was delayed the senior lienholders would foreclose, and Garfinkle would execute upon Levin's share of the purchase money mortgages. (T. 766).

160. Levin admitted at trial that he did not consider himself under duress at the time he signed the Cobblestones account stated letter, (T. 729), and I find that he was not under duress.

161. Levin and Creskoff both testified that they believed that the $777,935 balance shown on the Cobblestones account stated letter did not reflect Levin's true account

with Garfinkle, but was subject to a final adjustment between the parties with respect to all their dealings. (T. 1361). I reject that testimony as not credible.

## N. *The U.C.C. Sale of Levin's Interest in the Mortgages*

162. At a meeting between Garfinkle, Levin and Creskoff several days after the last closing, Garfinkle informed Levin that he considered Levin liable for the $777,935 in the last account stated letter, and that no further accounting had been agreed to, although he was willing to give Levin a credit of $183,125 because of Garfinkle's loss of the Timberline property. *See* Findings 183–190, *infra*. (T. 842; 1105; 1906).

163. Shortly thereafter, Levin renounced his indebtedness under the deed of trust, (T. 1731), and Garfinkle instructed Fensterheim not to disburse any further moneys to Levin from payments made to HAW Corporation by the buyers under the purchase money mortgages on the properties. (T. 1792).

164. Levin had paid no interest under the deed of trust from April 1, 1977, to the time of the U.C.C. sale of his interest in the purchase money mortgages on the Charlotte properties. In correspondence with Fensterheim, Levin advised that he and Garfinkle had reached an agreement at the Greenhouse closing that no more interest would be due under the deed of trust. (P–326; P–329; P–331). Although Fensterheim disputed the alleged agreement, Levin stopped making payments. When Levin, at a later date, renounced further liability under the deed of trust, Garfinkle declared a default, with the result that interest became due at a penalty rate of $11,655 per month.

165. When Levin made no further payments, Garfinkle instructed Fensterheim to proceed to sell Levin's share in the purchase money mortgages on the Charlotte properties which Levin had pledged as collateral for his debt under the deed of trust, in accordance with the Uniform Commercial Code.

166. The sale took place on November 15, 1977. Levin's counsel stipulated that they would not challenge the adequacy of notice for the sale, but read a prepared statement at the sale announcing their intention to contest the sale. (T. 785–786); (D–126, ¶ 39).

167. HAW Corporation purchased Levin's share in the mortgagees at the sale for $500,000.

### O. *Other Alleged Frauds in Connection with Sale of Charlotte Properties*

### 1) *Garfinkle's Refusal of the Wraparound Mortgage on the Chatham Square Property*

168. Under the November 8 agreement, Garfinkle was Levin's agent in the sale of the Charlotte properties. (P–365, ¶ 51); *see* Finding 86, *supra.*

169. In December, 1976, the Chatham Square property was placed under agreement of sale with Investors Economic Systems (IES), a real estate syndication firm headquartered in New Jersey. (T. 943).

170. Virtually all of the negotiations for the property, including negotiation of the agreement of sale, and financing for the property, were conducted by Garfinkle. (T. 937–939; 941; 946).

171. The property was to be sold for cash and a purchase money mortgage. After signing the agreement of sale, IES decided to use a wraparound mortgage in financing the sale.

172. A wraparound mortgage encompasses all existing liens on a property in one package, and the face amount of a wraparound reflects the total indebtedness on the property. The holder of the wraparound mortgage receives level payments calculated on the basis of the aggregate indebtedness at the time the mortgage is created, and he in turn makes payments to all holders of the underlying mortgages on the property. Over time, the underlying mortgages are satisfied, while the holder of the wraparound continues to receive the same payments, thus realizing a substantial profit because he need not funnel the payments he receives on the wraparound into payments on the underlying liens. (T. 951–952).

173. A wraparound mortgage is particularly advantageous from a tax standpoint to someone who has substantial losses to offset the interest income received from the mortgagors during the early years of the wraparound. (T. 953). Levin had substantial losses to offset the income. (T. 376).

174. The value of the wraparound mortgage proposed by IES had a net face value (value in excess of the underlying mortgages) of $1.2 million, (T. 955), and the holder of the mortgage would have received $3,000,000 in payments in excess of what he would pay out on the underlying mortgages. (T. 956).

175. Under Pennsylvania Securities Commission regulations, IES could not hold the wraparound mortgage itself. (T. 954). It therefore offered the wraparound to Levin through Garfinkle, his agent in the transaction. (T. 954, 959).

176. Garfinkle agreed to accept the wraparound mortgage, but then demanded that stringent conditions be met as the price for acceptance. (T. 961, 962). Several times Garfinkle accepted the wraparound mortgage, only to reject it later. (*Id.*)

177. Strict SEC rules required that IES prepare a lengthy disclosure statement for its investors. (T. 963–965). Without receiving a final answer from Garfinkle, IES could not prepare the necessary documents. *See* (P–252).

178. Garfinkle refused to make a firm commitment on the wraparound mortgage. Finally, so much time passed that IES could not complete its offering documents if it waited any longer for a firm answer. (T. 965). Garfinkle was aware of IES' deadline, and knew that it would have to offer the wraparound to another party if Garfinkle would not accept it. (*Id.*) Nonetheless, Garfinkle refused to give a definite answer to accept the wraparound mortgage, with the result that IES offered it to a third party.

179. Garfinkle informed Levin that he would receive the wraparound mortgage at the closing of the property. (T. 374–375). It was at the closing that Levin learned for the first time that he would not receive the wraparound. (T. 375–376). At closing, Garfinkle told Levin that IES had chosen to give the mortgage to another party. (T. 376).

180. During the closing, Garfinkle telephoned Creskoff and told him that the recipient of the wraparound mortgage was "making the score of a lifetime and he was not paying a dime for it." (T. 1108).

181. Garfinkle contended at his deposition that he refused the wraparound mortgage because the particular one offered them was a "tax scam" that he would not be a party to, (T. 1013), although in at least four prior transactions Garfinkle had proposed or utilized wraparound mortgages to finance sales. (T. 996).

182. If Garfinkle had accepted the wraparound mortgage Levin would have acquired an asset with a face value of $1.2 million, without any expenditure on his part.

2) *Garfinkle's Performance Under the Hunt Club and Timberline Mortgages*

183. As noted above, Finding 121, *supra*, Garfinkle and Fensterheim purchased the Hunt Club and Timberline properties from Levin through corporations established specifically for that purpose.

184. Under the terms of the Hunt Club mortgage, interest payments of $1,395.27 were due every month from May 1, 1977, to April 1, 1978. (P–365, ¶ 7).

185. Under the terms of the Timberline mortgage, interest payments of $1,526.04 were due every month for the same period of time. (P–365, ¶ 9).

186. None of the payments due under the mortgages (which were assigned to HAW Corporation) were ever made, (P–365, ¶ 8, ¶ 10), and thus Levin never received his participating share from those mortgage payments either in money or credit against his indebtedness under the deed of trust.

187. At some point, Garfinkle stopped making payments on the senior mortgages on the Timberline apartments, with the result that the senior mortgagees commenced a foreclosure action. (T. 1521–1522). Garfinkle told Daryl Greenberg, manager of the property, that he was going to force the banks to foreclose so that the liens behind the senior mortgages would be wiped out. It was Garfinkle's plan to buy the properties back from the banks on foreclosure.

188. While Garfinkle was permitting the banks to foreclose, he was stripping the property of rents. During April, 1977, Garfinkle had Greenberg wire $37,241.63 from the Timberline property to New York. (T. 1507–1508); (P–324; P–325). During May, June, and July of 1977, Garfinkle had Greenberg wire at least $31,000 from the Timberline property to New York. (T. 1509); (P–234; P–235).

189. The banks ultimately foreclosed on the property, destroying the junior mortgage in which Levin had an interest. Garfinkle offered Levin a credit of $183,125 because of this foreclosure. *See* Finding 162, *supra*.

190. Levin neither accepted nor rejected Garfinkle's offer of a credit, but in lieu of a direct response filed this lawsuit. (T. 1906).

191. Garfinkle and Fensterheim also received rents from the Hunt Club property, during the period in which they were not paying to Levin any of his share under the mortgage. In May, June, and July, 1977, Daryl Greenberg wired approximately $9,000 from the Hunt Club property in accordance with directions supplied by Garfinkle and Fensterheim in New York. (P–325); (T. 1509–1510).

3) *Garfinkle's Retention of Extra Proceeds from the Sheffield Farms Sale*

192. Shortly after they purchased the Sheffield Farms property from Levin in May, 1977, the purchasers discovered that they had made an error in their offering memorandum concerning the timing of interest payments under the mortgage. (T. 1208–1212).

193. Because the terms of the mortgage with HAW Corporation did not correspond to the terms outlined in their offering document the purchasers faced potential problems with their investors. (T. 1210). Accordingly, they contacted Garfinkle to negotiate a modification of the mortgage. (*Id.*)

194. The purchasers met with Garfinkle, K. B. Weissman, and Edward Breger in Breger's office in New York, on June 15, 1977. (T. 1212).

195. Garfinkle approved the modification of the mortgage, on the condition that the purchasers increase the principal amount of their indebtedness by $50,000, and pay immediately $30,000 as an interest penalty. (T. 1213–1214); (P–244). The $50,000 increase in indebtedness took the form of a note payable directly to K. B. Weissman. (P–209, p. 4).

196. When the parties executed the modification of the mortgage, in addition to the $30,000 penalty paid on that date, the purchasers also paid $50,000 in advance amortization under the original mortgage, which was not due until August 15, 1977. (T. 1214); (P–244, p. 2).

197. At the June 15 meeting to modify the mortgage, the purchasers asked why Levin was not present. (T. 1218–1219). The purchasers were informed that Levin no longer had an interest in the transaction, notwithstanding that the checks for the additional proceeds, as well as for the amortization payment, were made out to "Edward Breger as attorney for Bennett Levin." (T. 1217–1219); (P–336).

198. On the advice of their attorneys, the purchasers asked for and received a letter from Breger certifying that Levin's consent to the transaction was not necessary. (P–208, p. 2).

199. Of the $80,000 received from the Sheffield Farms purchasers at the June 15, 1977 meeting, Breger deposited $65,000 in his attorney's account. Breger disbursed the funds to Weissman, Garfinkle, and himself. (T. 1835–1836); (P–346E). The remaining $15,000 received on June 15, 1977, was endorsed to a third party to satisfy an obligation of Garfinkle's. (T. 1214; 1217).

200. Levin did not learn of the negotiation of additional proceeds for the Sheffield Farms property until the discovery proceedings in this lawsuit.

201. Defendants have introduced no credible evidence that Levin was ever given credit for his share of the $50,000 in additional proceeds, the $30,000 interest penalty, or the $50,000 in prepaid interest paid at the time of the mortgage modification. I find that he was not given such credit.

#### 4) *Interest Payments Received by Defendants After the Sale of the Charlotte Properties*

202. After the sale of the Charlotte properties, Asher Fensterheim received payments under the purchase money mortgages assigned to HAW Corporation. In some instances, Fensterheim failed to pay or to credit to Levin his share. Fensterheim's failure to do so after Levin's renunciation of his indebtedness, in August, 1977, was the result of Garfinkle's instructions to him not to pay Levin any more of his share. *See* Finding 165, *supra.*

203. On July 18, 1977, Asher Fensterheim received $2,255.05 in amortization from the purchasers of the Chatham Square Property. (T. 1762–1763). Fensterheim did not distribute or credit any of this money to Levin. (T. 1764).

204. On August 2, 1977, Fensterheim received $2,200 in amortization payments from the purchasers of the Southgate property. (T. 1769). Fensterheim did not disburse any of this money to Levin, nor did he give Levin credit for it under the deed of trust. (T. 1770; 1783). Fensterheim disbursed part of the money to HAW Corporation, K. B. Weissman's son, Allan Weissman, Edward Breger, and himself. (T. 1772). Fensterheim disbursed Levin's share, $1,100, to HAW Corporation, (T. 1773), and did not give Levin credit under the deed of trust. (T. 1783).

205. On August 2, 1977, Fensterheim received $2,255 in amortization payments from the purchasers of the Chatham Square property. (T. 1774). Fensterheim did not disburse any of this money to Bennett, Le-

vin, (*id.*), and did not give him any credit for it under the deed of trust. (T. 1783).

206. After the sale of the Sheffield Farms (Hope Valley) property, Levin assigned the mortgage to HAW Corporation, which subsequently assigned it to K. B. Weissman. (T. 1221). On August 15, 1977, the purchasers of the Sheffield Farms property paid $25,000 in amortization to K. B. Weissman, and between August 29 and September 15, 1977, paid an additional $25,000 in $5,000 installments. (P–208, p. 5); (T. 1224–1225). Weissman credited the proceeds against a $275,000 loan from him to HAW Corporation. (P–363, Exhibit A, p. 7, ledger marked "HAW Corporation, Hope Valley"). Levin did not receive any credit for these payments under the deed of trust. (T. 1783).

207. On August 30, 1977, Fensterheim received $12,500 in prepaid interest from the purchasers of the Chatham Square property. (T. 1774). He did not disburse any of that money to Levin, (T. 1775), and did not give Levin credit for the payment under the deed of trust. (T. 1783). Fensterheim subsequently disbursed Levin's share in accordance with Garfinkle's instructions. (T. 1775).

208. On September 1, 1977, Fensterheim received $16,070.36 in amortization payments from the purchasers of the Cobblestones property. (T. 1777). He did not disburse any of that money to Levin, (T. 1778), and did not give Levin credit for the payment under the deed of trust. (T. 1783). He disbursed Levin's share to HAW Corporation in late October, 1977. (T. 1778).

209. On September 29, 1977, Fensterheim received $1,531.25 in amortization payments from the purchasers of the Cobblestones property. (T. 1780). He did not disburse any of that money to Levin, (*id.*), and did not give him credit for the payment under the deed of trust. (T. 1783). On October 28, 1977, he disbursed Levin's share to HAW Corporation. (T. 1780).

P. *Miscellaneous Transactions Between Levin and Garfinkle*

210. During the course of their dealings, there were a number of minor transactions between Levin and Garfinkle. Levin contends that he made numerous expenditures for Garfinkle's benefit for which he was never reimbursed.

211. Levin expended $11,165.53 for building materials for Garfinkle's Huckleberry Farm during 1975 and 1976. (T. 250–251); (P–90). Garfinkle reimbursed Levin to the extent of $6,000. (*Id.*) Moreover, several of these expenditures, in a total amount of $1,294, are encompassed in the release Levin signed on June 29, 1976. *See* Finding 38, *supra*; (D–6, D–7). Thus, Garfinkle's debt to Levin for the Farm purchases is $3,871. Garfinkle's liability for these and other personal debts to Levin was not discharged by the January 14, 1977 accounting, because that accounting was between Levin and TAFU Corporation, not between Levin and Garfinkle personally. *See* Finding 102, *supra*; (P–294).

212. In spring, 1977, Levin expended $20,500 for horse transportation and antique carriage restoration for the Huckleberry Farm. (P–365, ¶ 1). Garfinkle reimbursed him to the extent of $3,500 and thus Garfinkle's debt to Levin for these expenditures is $17,000.

213. Levin paid $1,771.53 to the Connecticut General Life Insurance Company, for premiums for Garfinkle and his family. (P–327); (T. 251–252). Garfinkle has not reimbursed him for this amount. (*Id.*)

214. On January 28, 1977, Levin paid $5,000 to Sidney Eagle, who was attorney for one Benjamin Marsh, to satisfy an obligation of Garfinkle's to Marsh. Levin was never reimbursed for his payment. (T. 289).

215. On June 30, 1977, Garfinkle received $10,917 from Solon Automated Services, as prepaid rent for Solon's right to operate laundry facilities at the Charlotte properties during Levin's ownership. (P–365, ¶¶ 2–3). Defendants have introduced no credible evidence that Levin was given credit for these payments, and they were received after the January, 1977, account-

ing between Levin and TAFU Corporation. *See* Finding 102, *supra.*

216. On June 8, 1977, Levin paid $5,698 to Leslie Kozsley, a horsetrainer at Garfinkle's Huckleberry Farm. (P–365, ¶ 1). Levin has never been reimbursed for this expenditure.

217. Levin signed a utility bond as a co-indemnifier with Garfinkle on a Houston, Texas, property. After the property was sold without the utility bills being paid, the bond was presented to Levin, in late 1976, and he paid $2,733 to satisfy the claim. (T. 423–425); (P–63).

218. In spring, 1976, Garfinkle suggested that collection of rents from the Charlotte properties be computerized. Levin expended $11,500 to have computer software installed in his Philadelphia office. (T. 425–426); (P–343). Levin sought credit for this expenditure when he purchased the Charlotte properties, but Garfinkle refused on the ground that Levin would have the use of the equipment during the period of his ownership. (T. 426). Garfinkle also had prepared programs to use in running the computers. When Garfinkle failed to pay for the programs, the programming company insisted that Levin satisfy the debt as a condition of doing business with it. Levin paid $4,500 to satisfy the debt. (T. 426–427); (P–344).

219. On January 21, 1977, Levin borrowed $200,000 from K. B. Weissman, secured by a mortgage on his residence and place of business. He gave $60,000 of the proceeds of the loan to Garfinkle. (T. 246–247). Levin and Garfinkle were to share repayment of the loan in proportion to their share of the proceeds, although only Levin was named on the note. (P–295); (T. 247). Garfinkle's monthly obligation was approximately $810. (*Id.*); (P–323; P–327). Garfinkle has not repaid his proportionate share, and Levin's $200,000 indebtedness under the note is the subject of a counterclaim by defendant Weissman in this action. *See* Findings 255–259, *infra.*

220. As noted above, at the time he purchased the Charlotte properties, Levin agreed to pay certain past due mortgages.

*See* Finding 39, *supra*; (P–77). Garfinkle represented that a mortgage held by Thies Realty Company was past due in the amount of $7,327.33. Levin paid that amount on June 29, 1976. (P–78; P–345); (T. 122). As Levin was wiring out the payment, Cyrus West, a Garfinkle employee, stopped payment on a check for an earlier month's payment, increasing the amount of the delinquency by an additional $7,327.33. Thies Realty then deducted money to cover this earlier payment from Levin's escrow account. (T. 122–123); (P–84).

221. Levin made a $21,287.79 mortgage payment to Protective Life Insurance Company on Garfinkle's behalf in return for Garfinkle's promise to assume certain of Levin's obligations to Benjamin Douglas and Norman Septimus. (T. 123–125).

### Bromley Estates

222. As noted above, Finding 40, *supra*, at the time Levin purchased the Charlotte properties, he and Garfinkle signed a letter agreement stating that each would be entitled to one-half of the profits, and each would be liable for one-half of the losses, of a New Jersey property known as the Bromley Estates. (D–4).

223. Levin had a letter of credit issued for the Bromley Estates property through Industrial Valley Bank (IVB). As a result of litigation over this property, Levin made an agreement with IVB to secure a release from liability in return for a payment of $50,000. Garfinkle agreed to forward this payment out of Garfinkle's share of the proceeds from the Cobblestones property sale and Breger wrote to IVB promising payment. However, this money was never forwarded to the bank. (T. 131); (D–127, Tax XYZ).

224. Subsequently, IVB entered judgment against Levin in the amount of $6,000,000, although his precise liability under the judgment has not been determined.

### Sutton at Collingswood

225. Garfinkle also agreed to indemnify Levin for any liability arising out of work

Levin had performed at a New Jersey property known as Sutton at Collingswood. *See* Finding 40, *supra* ; (D–4).

226. With respect to one claim arising out of this property, Garfinkle partially indemnified Levin, with Levin paying part of the settlement and legal fees. (T. 130).

227. Other lawsuits involving the property are currently pending against Levin. (*Id.*) The record does not reflect whether Levin gave Garfinkle notice and an opportunity to defend against these claims, as is required by the indemnification agreement. (D–5).

### The Peck Judgment

228. Jack Deutschmann was an employee of Garfinkle's during late 1975 and early 1976. He advanced at least $98,000 to the Garfinkle operation. (T. 141).

229. In July, 1976, Garfinkle decided to repay Deutschmann the moneys which he had invested. Levin agreed to guarantee the note and to share in the repayment to Deutschmann on a fifty-fifty basis. (T. 254, 256); (P–82; P–89).

230. Levin contends that he assumed this obligation in return for Garfinkle's promise to convey to him one-half of Deutschmann's share in the Rondi River property in New York. (T. 256–257). However, this alleged agreement by Garfinkle does not appear in any of the writings concerning ownership of the Rondi River property, or concerning Levin's promise to share in payment of the obligation and this contention has not been established by a preponderance of the evidence.

231. Garfinkle defaulted on the note, and James Peck, as trustee for Deutschmann's relatives, commenced suit.

232. Levin testified that Fensterheim represented him in defending against the Peck judgment in New York, and that Fensterheim purposely allowed judgment to be entered against Levin in order to protect Garfinkle. The record does not support this contention.

233. After Peck instituted the lawsuit against Garfinkle, and against Levin as guarantor, settlement negotiations ensued. (T. 2058–2059). A stipulation was prepared under which Fensterheim represented both Levin and Garfinkle, but Levin objected that he did not want Fensterheim as his counsel. (P–171); (T. 2056). A second stipulation was then prepared in which Fensterheim represented Garfinkle as defendant, and Levin was included only as a guarantor. (P–171A). Peck rejected this stipulation. Finally, a third stipulation was prepared, in which Levin was represented by a New York lawyer named George Cappiello. (D–110).

234. Negotiations broke down, and on December 3, 1976, Fensterheim wrote to Howard Creskoff, warning him that there was a possibility of a default judgment being entered against Levin. (D–111). In December, 1976, Creskoff negotiated a settlement of the Peck matter on Levin's behalf, whereby Levin was to sell certain parcels of real estate and forward the proceeds to Peck. (D–112).

235. In January, 1977, Peck moved for a default judgment, and Fensterheim learned of his motion in connection with Fensterheim's representation of Garfinkle in the matter. He then wrote to Peck, protesting the motion for a default judgment, because Creskoff was out of the country at the time. (D–113).

236. A default judgment was entered against Levin sometime in February, 1977. (T. 2060).

237. Judgment in the Peck matter has also been entered against Howard Garfinkle in New York. (T. 1113).

### ·Q. *Levin's Dealings with K. B. Weissman*

238. During Levin's ownership of the Charlotte properties, Weissman held mortgages on the Southgate and Cobblestones properties. Levin made payments to Weissman on account of those mortgages.

239. On July 29, 1976, shortly after his purchase of the Charlotte properties, Levin paid $29,000 to Weissman. (P–363, ¶ A.3). Levin had agreed to pay certain past due

mortgage payments in connection with the purchase, see Finding 39, *supra*, one of which was a $24,000 payment due to City Federal Savings and Loan. Levin sent a check to cover this payment, but was informed by Garfinkle that the check had bounced, and that Weissman had made the payment. (T. 128). The $29,000 payment from Levin to Weissman on July 29 reflected in part Levin's reimbursement to Weissman for this expenditure.

240. Levin's check in fact had not bounced, (T. 128), and thus Levin did not owe Weissman the $24,000. Levin was never given credit for the $24,000 by Weissman against any of his indebtedness to Weissman. (P–363, B.7).

241. On July 29, 1976, Weissman lent Levin $50,000. (P–363, ¶ C.a).

242. Levin repaid this loan between August 2, and August 13, 1976, with ten $5,000 payments. P–353, ¶ A.4, 5, 7, 8, 9, 10, 11, 13, 14, 16).

243. On August 13, 1976, Weissman lent Levin $40,000. Levin gave to Weissman a note for $50,000, because Weissman contended that two of Levin's checks in repayment of the earlier loan had bounced. (P–105); (T. 234–235).

244. Levin's checks in fact had not bounced, and thus he did not owe Weissman the extra $10,000 he agreed to pay in the August 13 note. (T. 234–235).

245. Because of cash problems, Levin could not meet payments on the August 13, 1976 note. In the first week of September, Garfinkle informed Levin that he had paid Weissman $11,000 on Levin's behalf, representing $10,000 principal, and $1,000 interest on the loan. On September 9, 1976, Levin paid $11,000 to Barbara Garfinkle in repayment of Garfinkle's advance to Weissman. (T. 193–194); (P–117).

246. Levin executed a letter to Fensterheim acknowledging that the $11,000 payment to Barbara Garfinkle was not on account of the deed of trust, but represented repayment of a personal obligation to Garfinkle. (P–117).

247. Weissman never gave Levin credit for the $11,000 payment allegedly made by Garfinkle. (T. 193–194). *See* (P–141), (P–187).

248. On September 10, 1976, Levin paid $18,000 to Weissman. (P–363, ¶ A.18). He made this payment as a showing of good faith in order to induce Weissman to lend him further money. (T. 190–191).

249. Weissman never gave Levin credit for the $18,000 payment. (T. 204–205; 236A). *See* (P–141), (P–187). Instead, Weissman recorded the $18,000 payment as a credit to "Acquisition," a reference to Acquisition Management Corporation, which was a Garfinkle corporation (P–363, ¶ B.9); (P–364, ¶ 1).

250. On September 15, 1976, Garfinkle caused the Rondi River Realty Corporation to borrow $50,000 from Weissman, secured by the Rondi River property. (P–123; P–128).

251. Ten thousand dollars of the September 15 loan was endorsed back to Weissman on account of Levin's unsecured $50,000 indebtedness to him. (*Id.*) Levin was unaware of the loan, or that $10,000 had been paid against his debt to Weissman. (T. 200).

252. Weissman gave Levin credit for the $10,000 in proceeds from the Rondi loan in his ledgers. (P–363, ¶ B.8). Garfinkle and Weissman agreed that Weissman would begin to return the $10,000 to Garfinkle, as soon as Levin's payments to Weissman exceeded $10,000. (P–124, p. 1). On November 16, 1976, Garfinkle relieved Weissman of his obligation to return any of the $10,000 to Garfinkle. (P–124, p. 2).

253. Although Garfinkle had relieved Weissman of any obligation to forward the $10,000 to him, and Weissman's ledgers showed the $10,000 as a credit to Levin, on December 14, 1976, Weissman wrote to Levin and demanded payment of the $50,000 note without informing Levin of the $10,000 payment from the Rondi loan. (P–187).

254. In August, 1977, Garfinkle sent a mailgram to Weissman in which he threatened to reveal "duplicate cash bonuses"

Weissman had extracted from Levin. (P–272). On August 30, 1977, Garfinkle retracted the mailgram in a letter to Weissman, at the same time that he negotiated adjustments in various agreements he had with Weissman. (P–273; P–277; P–278; P–279); (T. 1919).

255. On January 21, 1977, Levin executed a $200,000 note to Weissman. The note encompassed both Levin's outstanding debt to Weissman and new funds lent to him by Weissman:

| | | |
|---|---|---|
| a) | old debt claimed | $35,800 |
| b) | advance 1/19/77 | 50,000 |
| c) | advance 1/21/77 | 50,000 |
| d) | advance 1/21/77 | 48,800 |
| e) | advance 1/24/77 | 2,400 |
| f) | prepaid interest | 13,000. |

(P–363, ¶ D). Garfinkle received $60,000 of these funds. See Finding 219, supra.

256. In calculating Levin's outstanding balance at the time of the $200,000 loan, Weissman gave Levin credit for a payment of $4,200 made by Levin on September 16, 1976, (P–141; P–363, ¶ A.19), and for $10,000 in payments made by Levin from October through December of 1976. (P–187; P–363, ¶¶ A.23, 24, 25, 28, B.5). The note did not reflect credit for the $18,000 payment Weissman received from Levin on September 10, 1976, (Finding 248, supra); it included no credit to reflect that Levin had repaid his first $50,000 loan from Weissman in full, and had not fallen short by $10,000, (Finding 244, supra); it included no credit for the $10,000 Garfinkle received from the proceeds of the Rondi River loan, (Finding 251, supra); and it included no credit for the $11,000 Garfinkle allegedly paid to Weissman on Levin's behalf, (Finding 245, supra).

257. In executing the $200,000 note to Weissman, Levin signed his wife's signature to a mortgage on their personal residence without his wife's knowledge or consent. (T. 793).

258. On numerous occasions during 1977, Levin sought an accounting from Weissman for payments he had made to him. Levin wrote to Weissman on April 25, (P–321), May 31, (P–231), June 27, (P–247), July 19, (P–257), and July 20, (P–259), each time requesting an accounting, and often enclosing records and ledger sheets as proof of various payments to Weissman. (T. 238–239).

259. Weissman never rendered an accounting to Levin, and Levin stopped making payments on the $200,000 note to Weissman.

R. *Levin and Garfinkle's Investment in the Rondi River Property*

260. In late 1975, Levin and Garfinkle invested in a property on Riverside Drive in New York, referred to by the parties as the Rondi River Property. (T. 46). Breger organized the Rondi River Realty Corporation to hold title to the property, (T. 46–47), and Levin executed the purchase documents as president of the corporation. (P–11; P–12; P–15).

261. Levin contributed $25,000 cash to the purchase, and was informed that he would be granted a 25% interest in the property. (T. 46).

262. At the time of the purchase, Garfinkle and Fensterheim caused the corporation to borrow $40,000 from Weissman, secured by a loan on the Rondi River property. The $40,000 represented Garfinkle and Fensterheim's contribution to the purchase price. (T. 50).

263. After the property was purchased, Levin sought his shares from Garfinkle and Fensterheim, but was told that no shares had been issued. In fact, 200 shares had been issued, 180 to Czar Realty Corporation, a Garfinkle corporation, and 20 to Asher Fensterheim, without Levin's knowledge. (T. 58–59); (P–17; P–19). Garfinkle subsequently gave Levin a letter recognizing his 25% interest when Levin purchased the Charlotte properties. See Finding 95, supra.

264. At the closing of the purchase of the Rondi River property, Levin executed a letter of credit guaranteeing that $50,000 would be spent on certain repairs to the property. The letter was presented for payment in fall, 1976, and Levin paid $10,-

000 in settlement of his obligations under the letter. (T. 61); (P–13). Levin also paid $1,000 interest on the letter. (T. 67). He was never reimbursed for these expenditures.

265. Levin provided professional services to the Rondi River Realty Corporation worth $2,602.55. (T. 65–66).

266. Levin paid $2,500 to James Rolland, Jr., an electrician who did work on the Rondi River property, for which he was never reimbursed. (T. 66).

267. Levin paid various bills on behalf of the Rondi River Realty Corporation, in the amount of $12,346.92, for which he was never reimbursed. (T. 67); (P–9).

268. None of the items in Findings 264 to 267 were covered by the June 29, 1976 release between the parties, *see* Finding 38, *supra*, because Rondi River Realty Corporation was not a party to the release. *See* (D–6).

269. On August 17, 1976, Levin advanced $4,510.83 to Rondi River Realty Corporation to enable it to meet a payment due Semorco, a senior lienholder on the property, for which Levin was never reimbursed. (T. 173); (P–346A). On September 29, 1976, he made a similar advance in the amount of $6,390.96, (T. 67–68), (P–365, p. 2), for which he was reimbursed to the extent of $6,000.

270. During the period up to the end of June, 1976, Levin lent a total of $60,500 to Rondi River Realty Corporation. (T. 68–69); (P–66). However, this $60,500 was consolidated with debts owed to Levin by Acquisition Management, Inc., (T. 70–71), and was discharged by the June 29, 1976 release and letter of agreement. (D–6; D–3, ¶ 17).

271. Fensterheim prepared a series of Minutes, Waivers of Notice, and Consents with respect to purported meetings of the shareholders and Board of Directors of the Rondi River Realty Corporation. (T. 1609); (P–19; P–20; P–21; P–22; P–23; P–49; P–50; P–51; P–52). These meetings in fact never took place, (T. 1609–1610), and Levin was never shown the minutes of the purported meetings. (T. 72).

272. On March 23, 1976, Fensterheim replaced Levin as president of Rondi River Realty Corporation, without Levin's knowledge. (T. 72).

273. During the period that the property was owned by the Rondi River Realty Corporation, it had a monthly income of approximately $10,000. (T. 78; 83–84); (P–47).

274. On February 4, 1976, Howard Garfinkle caused Rondi River Realty Corporation to borrow $105,000 from K. B. Weissman, secured by a mortgage on the property. Garfinkle controlled distribution of the proceeds. (P–363, ¶ 33). Levin was unaware of this transaction at the time it occurred. (T. 90).

275. In connection with the February 4, 1976, loan, Breger certified to Weissman that the transaction had been approved by all stockholders of Rondi River Realty Corporation, (P–40), although he never sought consent from Levin. (T. 91). Breger admitted at his deposition that he was aware of Levin's interest in the property. (T. 52–53; 56–58).

276. On September 2, 1976, Fensterheim, as vice president of Rondi River Realty Corporation, entered into an agreement to sell the property to Arnold Tamaroff. (T. 111). Tamaroff paid $25,000 deposit money to Breger as attorney for the corporation. Breger paid the money to the Rondi River Realty Corporation, which subsequently transferred it to the account of the Markham Company, from which it was disbursed at the direction of Howard Garfinkle. (T. 1831–1833); (P–113; P–120; P–121; P–122).

277. On September 15, 1976, Garfinkle and Fensterheim caused Rondi River Realty Corporation to borrow $50,000 from Weissman, secured by a mortgage on the property. Garfinkle controlled distribution of the proceeds. (P–365, ¶ 34; P–134; P–135). Levin was unaware of this transaction. (T. 99).

278. On September 30, 1976, Rondi River Realty Corporation sold its property to

LeTam Realty Corporation. In addition to the $25,000 deposit money previously received, Rondi River Realty received $100,000 cash, and a purchase money mortgage in the amount of $491,436.07. (P–146; P–147). Fensterheim executed all of the closing documents, acting as president of Rondi River Realty Corporation.

279. At the time of the closing, Garfinkle and Fensterheim caused Rondi River Realty Corporation to borrow an additional $65,336.22 from Weissman, secured by a pledge of the mortgage received from the purchasers of the property. (P–365, ¶ 35). They consolidated this indebtedness with their prior loans from Weissman, executing a new note in the amount of $210,000. (P–150).

280. The proceeds from the consolidated loan, and the cash proceeds from the sale, were disbursed at the direction of Garfinkle. (P–153); (T. 102–103). Levin received only $6,000 from these funds. (P–153).

281. Levin did not learn that the Rondi River property had been sold until he was informed by Brian Lewis, a Garfinkle employee, in late October, 1976. (T. 98–99). Upon learning of the sale, he demanded an accounting from Garfinkle, but the accounting was never rendered.

## DISCUSSION

### I. *Levin's Purchase of the Charlotte Properties from Garfinkle*

Levin seeks to rescind his purchase of the Charlotte properties, or alternatively, to recover damages on the ground that he was fraudulently induced to buy the properties by Garfinkle.

First, Levin contends that his purchase of the properties should be rescinded because Garfinkle made false representations to him during negotiations for the purchase of the

properties, and breached the oral promises which he made to Levin. Defendants contend that consideration of these representations and promises is barred by the parol evidence rule.[4]

The contract for the sale of the Charlotte properties is comprised of several writings. *See* Findings 34–35. It is well-established that the parol evidence rule prevents a party to a contract from attempting to avoid the contract on the basis of alleged oral agreements between the parties that vary or contradict the terms of the written instrument. *Globe Motors, Inc. v. Studebaker-Packard Corp.*, 328 F.2d 645 (3d Cir. 1964); Restatement of Contracts, § 237 (1932). Levin has a particularly heavy burden to carry in urging that Garfinkle's oral representations and promises be considered a part of the contract, because the agreement of sale for the properties contained an integration clause stating that the parties had no agreements between them except as set forth in the written instrument. *See* Finding 50; (D–8, ¶ 25). *Appeal of Edwin J. Schoettle Co.*, 390 Pa. 365, 134 A.2d 908 (1957); *National Cash Register Co. v. Modern Transfer Co.*, 224 Pa.Super. 138, 302 A.2d 486 (1973). To overcome the rule, Levin relies on the principle that the parol evidence rule does not apply when fraud, misrepresentation, or duress are present. *See, e. g., American Empire Insurance Co. v. Hanover National Bank of Wilkes-Barre*, 409 F.Supp. 459 (M.D.Pa.), *affirmed* 556 F.2d 564 (3d Cir. 1976); *Feuerstein v. New Century Realty Co.*, 304 Pa. 271, 156 A. 110 (1931).

Pennsylvania law[5] is clear that where the contract specifically states that all agreements dealt with by the parties are covered by the written agreement between them, a party seeking to avoid the contract on the basis of some collateral agreement

4. Because the parol evidence rule is a rule of substantive law, rather than an exclusionary rule of evidence, *LeDonne v. Kessler*, 256 Pa. Super. 280, 389 A.2d 1123 (1978), I heard testimony on all of the alleged oral promises, and made factual findings with respect to them. The legal question under discussion here is

whether I may properly consider such evidence in contradiction of the written agreement between the parties.

5. The parties agree that Pennsylvania and New York law, one of which controls, are in agreement on the significant legal issues in the case.

must allege and prove that the collateral agreement was *fraudulently omitted* from the written contract. *Nicolella v. Palmer,* 432 Pa. 502, 507, 248 A.2d 20 (1968); *Bardwell v. Willis Company,* 375 Pa. 503, 506, 100 A.2d 102 (1953); *National Cash Register Co., supra,* 224 Pa.Super. at 146, 302 A.2d 486. It is plain from the evidence here that the oral agreements between Levin and Garfinkle were not fraudulently omitted, inasmuch as Levin and Creskoff were aware of the integration clause in the contract, and Creskoff was aware of potential problems in trying to enforce the oral agreements because of the clause. Finding 50.

Levin contends that Garfinkle's oral promises to him at the time of his purchase of the properties were fraudulently made, in that Garfinkle did not intend, at the time he made them, to honor those promises. Similarly, he argues that Garfinkle's misrepresentation of the rental income was fraudulent, in that Garfinkle knew at that time that the rental income was less than he stated to Levin. These contentions, however, are legally irrelevant, because the fraudulent nature of collateral agreements does not bear upon the written contract between the parties unless evidence of the collateral agreements may otherwise be considered through an exception to the rule. *Nicolella, supra; Bardwell, supra.*

Levin also contends that he was fraudulently induced to enter the June 29, 1976, agreement to purchase the properties by Garfinkle's oral promises and representations. Under Pennsylvania law, however, "a breach of faith or of an agreement regarding the doing or refraining from doing something in the future is not fraud, as that word is employed in the phrase 'fraud, accident, or mistake.'" *Sokoloff v. Strick,* 404 Pa. 343, 350, 172 A.2d 302, 305 (1961); *Palone v. Moschetta,* 387 Pa. 386, 392, 128 A.2d 37 (1956); *Hein v. Fetzer,* 301 Pa. 403, 408, 152 A. 388 (1930). In the instant case, with the exception of Garfinkle's misrepresentation of rental income, all of his oral promises to Levin involved future actions, *e. g.,* his promise to assist with the syndication of one of the properties, his alleged promise to forebear collecting interest, and Pennsylvania law simply does not recognize nonperformance of collateral promises to do something in the future as a ground for attacking a written contract between two parties.

Even if consideration of Garfinkle's oral promises and misrepresentations were not barred by the parol evidence rule, Levin would not be entitled to have the contract rescinded. "The successful maintenance of a cause of action for fraud includes, inter alia, a showing that the plaintiff acted in reliance on the defendant's misrepresentations." *Klemow v. Time, Inc.,* 466 Pa. 189, 197 n. 17, 352 A.2d 12, 16, n. 17 (1976); *Thomas v. Seamans,* 451 Pa. 347, 304 A.2d 134 (1973). At the time Levin purchased the properties, he executed the June 29th estoppel letter that detailed many of the problems with the properties about which he complains in this suit. Findings 43–45. Moreover, Levin admitted at trial that Garfinkle's promises and representations to him were not an important inducement leading him to purchase the properties, Finding 51, and that he believed the properties to be a good investment separate and apart from any promises or representations. Finding 64. Having made these admissions, Levin cannot rescind the contract or recover damages on the theory that the contract for the purchase of the properties was induced by Garfinkle's fraud.

Finally, even if Levin had relied upon Garfinkle's promises and representations, in his later dealings with Garfinkle he compromised certain of his disputes with Garfinkle and ratified the June 29 agreement to purchase the properties. For instance, he relieved Garfinkle of the obligation to lend him $100,000 interest free. Finding 94. He paid Garfinkle interest on the deed of trust without protest, notwithstanding the alleged agreement by Garfinkle to forebear. Finding 49. He received a $150,000 credit against his indebtedness under the deed of trust as compensation for Garfinkle's misstatement of the rental income. Finding 89. Finally, Levin certified at the time he

signed the November 8 agreement that when he purchased the Charlotte properties, he was represented by counsel and had not been subjected to any fraud or intentional misrepresentation. Finding 91.[6]

A contract induced by fraud is not void, but only voidable. *Associated Hardware Supply Co. v. Big Wheel Distributing Co.*, 355 F.2d 114 (3d Cir. 1965), *Stimson v. Stimson*, 346 Pa. 68, 29 A.2d 679 (1943), and may be ratified by the parties. *Allegany Gas Co. v. Kemp*, 316 Pa. 97, 174 A. 289 (1934). *See National Auto Brokers Corp. v. Aleeda Development Corp.*, 243 Pa.Super. 101, 105, 364 A.2d 470, 476 (1976), citing Restatement of Contracts, §§ 493, 495, 499 (1932). Failure to act promptly to rescind the contract once the fraud is discovered results in waiver of the right to rescind. *Sixsmith v. Martsolf*, 413 Pa. 150, 196 A.2d 662 (1964).

Here, Levin was aware of at least one of Garfinkle's misrepresentations within a month after purchasing the properties when the rent receipts failed to keep pace with Garfinkle's projections, yet he did not seek rescission at that time. Moreover, as noted above, he made various settlements with Garfinkle and affirmed the June 29 agreement in the course of further dealings with him. On these facts, whatever misrepresentation may have been made in negotiations for the properties, Levin must be deemed to have ratified the agreement.

Levin also contends that he has stated a cause of action in tort, and that the evidence of misrepresentations barred by the parol evidence rule under his contract theory is properly considered under this theory of the case.

Although all of the evidence of Garfinkle's promises and misstatements may be considered as proof of the tort of misrepresentation, *Rempel v. Nationwide Insurance Co.*, 471 Pa. 404, 370 A.2d 366 (1977), this does not aid Levin, because he has nonetheless failed to establish that he relied upon Garfinkle's representations. *Klemow, supra; Thomas v. Seamans, supra.*

II. *Levin's Consent to the November 8 Agreement*

At trial, Levin contended that he acted under duress when he entered into the November 8 agreement to sell the properties.

" . . . [T]he making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid, or excuse him from performing the contract." *Tri-State Roofing Co. v. Simon*, 187 Pa.Super. 17, 20, 142 A.2d 333, 335 (1958). *Accord, National Auto Brokers v. Aleeda, supra.* In order to establish duress, it is necessary to prove that (1) serious economic injury was imminent, (2) exerting such pressure that the party involuntarily executed an agreement leading to economic loss, and (3) there was no immediate legal remedy available as an alternative to executing the agreement. *Id.* 243 Pa.Super. at 105; 364 A.2d at 474. The pressure exerted on the party purportedly under duress must be so severe as to "overcome the mind of a person of ordinary firmness," and where "persons deal with each other on equal terms at arm's length, there is a presumption that the person alleging duress possesses ordinary firmness." *Carrier v. William Penn Broadcasting Co.*, 426 Pa. 427, 431, 233 A.2d 519, 521 (1967). Where a party is free to consult with counsel, the presumption against duress is even stronger, and only physical restraint preventing consultation with counsel will establish duress. *Id.*

At the time that Garfinkle presented the November 8 letter agreement to Levin, Levin feared that Garfinkle's attempt to foreclose on the deed of trust would cause the senior lienholders also to foreclose, causing the properties to be placed in the hands of a receiver and leaving Levin without the resources to satisfy his indebtedness to Continental Bank. Findings 30, 97. Certainly, therefore, Levin was negotiating while

---

**6.** Levin claims he was under duress when he entered into the November 8 agreement. How-ever, as will be discussed below, there is no proof of duress in the legal sense.

threatened by serious financial loss, but, notwithstanding the seriousness of his situation, he has failed to establish that he acted under duress.

Levin is a sophisticated businessman, who certainly knew, after Garfinkle declared him to be in default and threatened a foreclosure, that he was dealing with Garfinkle at arm's length. Levin was also represented by Creskoff, Finding 93, who retained local counsel in North Carolina to investigate the alternatives available to Levin under North Carolina law. Finding 96. There is no evidence in the record to overcome the legal presumption that Levin contracted freely. Although the fear of possible foreclosure by other lienholders was certainly reasonable, it was quite apparent that injunctive relief could have been obtained to halt any attempted foreclosure on the property to enable Levin to fight what he believed to be a wrongful foreclosure by Garfinkle. The record makes plain that Levin's will was not overborne compelling him to execute the November 8 agreement. Rather it appears that Levin concluded that it was more prudent to settle with Garfinkle than to litigate. *See* Finding 97. Thus, although Levin was plainly in a very difficult position, he has not carried the heavy burden incumbent upon a party who seeks to establish duress.

Alternatively, Levin contends that the November 8 agreement should be set aside because it was induced by fraud, in that Garfinkle made oral promises to him during negotiation of the agreement which he subsequently broke. Specifically, Levin maintains that Garfinkle breached his promise to net a one-million dollar profit for Levin, Finding 87; his promise to split all of the mortgage proceeds after the last property was sold, Findings 85–86; and his promise that Levin's indebtedness under the deed of trust would cease with the last sale, Findings 110, 161. None of these promises was reduced to writing, and the defendants claim they may not be considered because of the parol evidence rule.

As with Garfinkle's other promises, these relate to some future event that was sup-

posedly to occur, and under Pennsylvania law such unkept promises are not fraud of the kind that permits the written agreements to be contradicted by oral testimony. *Sokoloff, supra; Palone v. Moschetta, supra.* The *Sokoloff* decision is particularly analogous to the instant case. There, a debtor who had signed a judgment note tried to defend against collection upon it on the ground that the creditor had promised never to enforce the note against him when he signed it. The court noted that to permit this defense would in effect permit every written agreement to be avoided on the ground that it was merely a formality which does not reflect the real agreement between the parties. 404 Pa. at 347, 172 A.2d 302. Here, Levin allegedly consented to pledge his share of the mortgages as collateral for the deed of trust, and allegedly consented to the junior/senior relationship, because of Garfinkle's assurances that these were merely temporary arrangements which Garfinkle would not seek to enforce against Levin. Clearly these are promises of future forebearances which do not constitute fraud sufficient to overcome the parol evidence rule under Pennsylvania law.

### III. *The January 14 Modification of the November 8 Agreement*

At trial Levin also suggested in some of his testimony that he entered into the January 14 modification of the November 8 agreement because of his desperate financial situation. It is unclear whether Levin is formally contending that this agreement is invalid because of duress, but if so, such a contention is rejected.

First, inasmuch as the January 14 agreement increased Levin's share of the purchase money mortgages from forty to fifty percent, he can scarcely be said to have suffered serious economic injury by executing the agreement. *National Auto Brokers v. Aleeda, supra.* Although it later turned out that Levin would have been better served by insisting that Garfinkle settle with him in cash, at the time the agreement was executed, Levin stood to gain, not lose, from the modification.

Second, there were no threats sufficient to overbear Levin's will. *Carrier v. William Penn, supra.* The only pressure exerted on Levin at the time he entered into the January 14 agreement was his shortage of cash. Had he solved his cash problems by entering into the agreement, it might be argued that a desperate and overwhelming need for cash forced him to execute the agreement. However, Levin's cash shortage was not eased by the January 14 agreement; consequently a desire to cure his cash shortage could not have forced him to execute the agreement against his will.

Third, Levin negotiated the January 14 agreement with the advice and assistance of counsel, Finding 103. Absent a showing that Levin was prevented from consulting with counsel, as a matter of law, there is no duress. *Id.*

IV. *The Account Stated Letters Executed at the Sale of the Charlotte Properties*

As set forth in the Findings of Fact, at the closing for each of the Charlotte properties, Levin executed a letter which listed the amount of cash and purchase money mortgages credited to HAW Corporation at each sale, and the amount of Levin's outstanding indebtedness under the deed of trust after the proceeds of each sale were taken into account. Findings 105–109. Under the terms of the November 8 agreement, Levin was to be given credit against his indebtedness for all cash, deposits, and mortgages received by HAW Corporation. Finding 88.

After the last sale, Garfinkle claimed that Levin still owed $777,935 under the deed of trust. When Levin announced his intention not to satisfy this debt, Garfinkle sold Levin's share of the purchase money mortgages, which had been pledged as collateral. Levin contends that the account stated letters are fraudulent, and that he executed them because Garfinkle assured him that they did not represent his true indebtedness, but rather were for Garfinkle's use with his internal participants. Levin testified that there was to be a final accounting

between the parties after the last sale which would reflect the true accounting between them, and that the account stated letters are inaccurate. The defendants contend that there was no private understanding between the parties, and that the account stated letters reflect compromises and adjustments negotiated by Levin and Garfinkle privately. As with the other documents, the defendants object under the parol evidence rule to my giving any consideration to Levin's testimony about the account stated letters, on the ground that the letters are clear on their face, and may not be contradicted by purported oral agreements between the parties.

The threshold issue with respect to the letters, (P–206), is whether the parol evidence rule applies to them. Under Pennsylvania law, "[t]he parol evidence rule, generally speaking, does not apply to receipts, letters, statements or books of account and other writings which do not purport to be a complete contract or vest or extinguish a legal right." *Bardwell v. Willis Co., supra,* 375 Pa. at 506, n. 1, 100 A.2d at 104, n. 1, *citing Wagner v. Marcus,* 288 Pa. 579, 136 A. 847 (1927); *Garrison v. Salkind,* 285 Pa. 265, 132 A. 125 (1926). *Accord, LeDonne v. Kessler,* 256 Pa.Super. 280, 284, n. 3, 389 A.2d 1123, 1126, n. 3 (1978). Levin contends that inasmuch as the letters are not in themselves a contract, and purport only to state the balance of the account between the parties, there is no bar to parol evidence to explain the documents.

Having reviewed the applicable Pennsylvania precedent, I agree that the parol evidence rule does not bar oral testimony that contradicts the account stated letters. The Pennsylvania courts have consistently ruled that where a writing is merely evidence of a transaction or an account, and does not purport to set forth the rights and obligations of the parties under a contract, it may be explained by parol evidence. Thus, where a writing is "evidence of the fact that [a party] agreed to reduce his claims to a certain figure," or "a written memorandum of a settlement," it is "open to explanation as to what trans-

actions were in fact covered by its general terms." *Garrison v. Salkind, supra*, 285 Pa. at 269, 132 A. at 126. *See Bauer v. P. A. Cutri Co.*, 434 Pa. 305, 253 A.2d 252 (1969). Here, the account stated letters executed by Levin did not set forth the terms of the contract between the parties; rather, they were memoranda relating to the performance of that contract. As such, they do not fall within the scope of the parol evidence rule, and I may properly consider Levin's testimony about the circumstances in which the letters were signed.

■ At the same time, however, there is a separate body of substantive law relating to accounts stated, and it is this law which governs whether Levin is bound by the letters. According to older Pennsylvania cases, a party who accedes to an account stated is bound by the terms of the account, absent a showing of fraud or mistake. *Spring Brook R. Co. v. Lehigh Coal & Navigation Co.*, 181 Pa. 294, 37 A. 525 (1897); *McClelland's Executor v. West's Administrator*, 70 Pa. 183 (1871); *Guhl v. Frank*, 22 Pa.Super. 531 (1903). *See Ranald S.S. Co. v. Wesenberg & Co.*, 122 F. 969 (E.D.Pa. 1903); *Krick v. Fairy Silk Co.*, 311 Pa. 202, 166 A. 554 (1933); *Tustin v. Philadelphia & Reading Coal & Iron Co.*, 250 Pa. 425, 95 A. 595 (1915). More recent cases have slightly softened the rule, and held that consent to an account stated is prima facie evidence of the correctness of the account, unless it is otherwise impeached. *Cauffiel v. Glenn*, 345 Pa. 181, 27 A.2d 30 (1942). *See Thrasher v. Rothrock*, 377 Pa. 562, 105 A.2d 600 (1954). Plainly, however, an account stated may be opened or set aside on the basis of evidence of fraud or mistake, *Cauffiel, supra, Thrasher, supra*, provided that the evidence is clear and convincing. *Easton v. Washington County Insurance Co.*, 391 Pa. 28, 37–38, 137 A.2d 332 (1957); *Steel v. Glass*, 189 Pa. 283, 42 A. 187 (1899); *Teller v. Sommer*, 132 Pa. 33, 18 A. 1071 (1890).

■ The issue then is whether Levin has convincingly proven that the account stated letters should be set aside for fraud or mistake, and for several reasons I conclude that he has not. First, it is obvious that at each closing there were a number of outstanding items to be paid which were Levin's responsibility, notably liens and back taxes. Findings 107, 154, 155; *see* Finding 68. These payments came out of the cash proceeds from the sale, and therefore, diminished Levin's share in the proceeds or the credit due to him. Thus, the detailed evidence presented by plaintiff that the account stated letters do not reflect all of the proceeds received from the various sales does not necessarily establish that Levin was defrauded, or that the letters were in error, for some of the proceeds went to satisfy these obligations. There were also various disputes between Levin and Garfinkle as to personal obligations between them at the closings which resulted in various adjustments. On their face, the letters do not purport to account for all of the proceeds from the sales, but only for those proceeds received by HAW Corporation. Indeed, defendants concede the existence of various omissions from the account stated letters.

Second, it is obvious that some process of negotiations between the parties went on at the closings. Finding 110. This provides at least a partial explanation for the apparent inconsistencies in the letters. Although I do not fully credit Fensterheim's testimony that he had no involvement in the creation of the account stated letters, *see* Finding 123, it is clear that Levin had to strike some form of compromise with Garfinkle and Fensterheim in arriving at the figures on the account stated letters. Findings 117, 107, 157. Levin was present at all of the closings, and had at least some awareness of how the proceeds were being disbursed, Finding 110, and I do not believe that he would have permitted the substantial adjustments against him reflected in the balances set forth in the account stated letters unless there was some basis for them.

More important, Levin's explanation that he signed the letters notwithstanding their inaccuracy lacks credibility. By the time Levin signed the account stated letters, he knew from past experience that Garfinkle was not a man whose oral promises and

representations could be safely relied upon. He also certainly knew that Garfinkle and he were not engaged in a cooperative venture, but were dealing as adversaries at arm's length. It is simply not believable that a man of Levin's experience and intelligence, assisted by counsel, would sign an account stated letter acknowledging liability for three quarters of a million dollars solely on the basis of Garfinkle's alleged representation that the document was for Garfinkle's internal use only, and that there would be a further accounting between them. Levin could easily have signed the letters with the notation "subject to a further accounting between the parties." Or, he could have executed a separate letter with Garfinkle reflecting an agreement between them that the account stated letters did not reflect the true account between them, similar to the numerous collateral agreements they executed in their other dealings. Levin has offered no explanation for his failure to take such simple precautions after having been duped by Garfinkle on so many prior occasions.

Thus, whatever negotiations may have occurred with respect to the account stated letters, Levin signed them without noting any reservations, and he has failed to produce sufficient evidence of fraud or mistake to set aside the letters.

Levin also contends that he is entitled to recover for fraud under tort principles and federal and state securities laws. With respect to the former theory, as the foregoing discussion makes clear, in light of the account stated letters, Levin has simply not produced sufficiently convincing evidence of fraud. With respect to the latter theory, Levin has not established the applicability of the securities laws to this case, and has not attempted to relate the facts to the requirements for recovery for fraud under the securities statutes. Thus, I have no basis on which to conclude that he is entitled to recover on this theory.

## V. Garfinkle's refusal of the Wraparound Mortgage

Levin also contends that Garfinkle is liable to him for breach of fiduciary duty for his refusal of the wraparound mortgage offered by the purchasers of the Chatham Square property.

▮ It is plain that Garfinkle was Levin's agent under the November 8, 1976 agreement. Finding 168. Under Pennsylvania law, an agent owes his principal a strict duty of loyalty, and must conduct the principal's affairs in the utmost good faith. *Phoenix Mutual Life Insurance Co. v. McLean*, 263 F.Supp. 246 (E.D.Pa.1967); *Sylvester v. Beck*, 406 Pa. 607, 178 A.2d 755 (1962); *Kribbs v. Jackson*, 387 Pa. 611, 129 A.2d 490 (1957). Whether the agent's conduct constituted a breach of duty is an issue of fact, *McRoberts v. Phelps*, 391 Pa. 591, 606, 138 A.2d 439, 447 (1958), and "[i]f conflicting inferences are possible as to abuse or opportunity the trier of facts must make the choice between them." *Id.*, quoting Justice Cardozo, *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928).

▮ It is noteworthy that the bulk of the evidence with respect to the wraparound mortgage consists of testimony by George David, a real estate investment consultant who worked for IES, the purchaser of Chatham Square at the time that Garfinkle was negotiating for the sale of the property. Mr. David has no interest in the instant case, and his credibility was not challenged by the defendants. David's uncontradicted testimony established that the wraparound mortgage constituted a valuable investment for whoever held it, in that its net face value was 1.2 million dollars, and over the life of the mortgage the holder would receive three million dollars in payments free and clear of underlying liens. Finding 174. He also established that the wraparound had substantial tax benefits for a holder who had losses to offset the income derived in the early years of the mortgage. Finding 173. His testimony that Garfinkle deliberately allowed the mortgage to be awarded to a third party rather than to Levin also stands unchallenged. Findings 175–178.

In light of David's highly credible testimony, the issue then is whether Garfinkle's explanation of his reasons for rejecting the wraparound are sufficiently convincing to support a finding that he rejected the wraparound in good faith. Garfinkle testified that he considered the mortgage a "tax scam" because it was offered to Levin for no consideration after the original agreement of sale had been signed, and he concluded that it was simply a device to create fictitious tax deductions for the purchaser. However, Garfinkle knew that this was not the case. David testified that IES normally used a wraparound mortgage in its transactions, which it held itself. In the Chatham Square purchase, after the agreement of sale was signed, it was learned that a provision of the Pennsylvania securities laws prohibited IES from both getting a commission from a transaction and holding the mortgage. Thus, the reason that Levin was offered the wraparound, as Garfinkle well knew, was to allow IES to maintain the financing it had contemplated for the purchase without risking a possible violation of the securities laws, not to create tax losses for IES. Findings 175–178.

Second, Garfinkle testified that he wanted "no part of" the wraparound because he felt it was improper. (T. 1014). Yet, David's uncontradicted testimony was that Garfinkle engaged in lengthy negotiations over the wraparound, and on more than one occasion agreed to accept it. Finding 176. Garfinkle's obvious interest in the wraparound is inconsistent with his testimony that he had strong feelings about its impropriety.

Third, as Garfinkle himself recognized, a wraparound mortgage in itself is not illegal. Garfinkle does not even contend that the wraparound proposed by IES was illegal, but only that it would have been "wrong" to accept it because Levin was not asked to pay any additional consideration for it, and IES, according to Garfinkle, would reap deductions from prepaid interest under the mortgage. Other than Garfinkle's conclusory assertions, there is no evidence in the record that IES would receive any improper tax deductions from Levin's holding the wraparound. More important, as a sophisticated real estate investor, Garfinkle most assuredly was aware that real estate transactions are very often structured with the goal of minimizing tax exposure. That Garfinkle, whom the record shows to be a very shrewd businessman, would be shocked by this, and consider it wrong, is simply not credible.

Defendants also contend in their proposed findings that Garfinkle rejected the wraparound because it created a risk of violating securities laws. However, there is no evidence in the record to support this contention; instead, I find that Levin was to become holder of the mortgage so that IES could avoid any securities' law problems.

It is also clear that it was to Garfinkle's advantage that Levin not receive the wraparound mortgage. There was apparently no benefit from the wraparound mortgage to the Garfinkle interests, whereas Levin would have had the benefit of the income of that mortgage or he could have sold it to a third party, which would have enabled him to loosen Garfinkle's financial stranglehold.

Garfinkle points to the language in the November 8 agreement appointing him as Levin's agent, which gave him "the absolute right and power" to sell the properties, "on such terms and conditions as you [Garfinkle] in your absolute discretion shall determine." (P–365, ¶ 51). Although I agree that this provision gave Garfinkle free rein in conducting negotiations, it did not relieve him of his fiduciary duty to Levin, or give him authority to negotiate in bad faith.

In sum, weighing David's highly credible testimony against the weak explanation offered by Garfinkle, I conclude that Garfinkle breached his fiduciary duty to Levin by refusing to accept the wraparound mortgage. Under Pennsylvania law, Levin is entitled to recover from Garfinkle the losses caused by the breach, or such damages as would under the circumstances most nearly make him whole. *Dubern v. Girard Trust Bank*, 454 F.2d 565, 570 (3d Cir. 1972); *Phoenix Mutual Life Insurance v. McLean, supra.*

VI. *Garfinkle's Retention of Additional Proceeds from the Sheffield Farms Sale*

Levin also contends that Garfinkle, aided by Breger and Weissman, defrauded him in connection with the receipt of additional proceeds from the sale of the Sheffield Farms property.

Again, it is noteworthy that the bulk of the testimony on Garfinkle's receipt of additional proceeds comes from a third party with no interest in this action, Anthony Scioli, one of the purchasers of the property. There is no doubt that Garfinkle did receive additional proceeds from the purchasers as a condition for altering the terms of the mortgage. Finding 195. Moreover, when Scioli's lawyer inquired why Levin was not a party to the transaction, he was informed that Levin no longer had an interest in the transaction. Findings 197–198. The transaction itself was structured in such a way as to make it appear that Weissman was making a loan to the purchasers, Finding 199, rather than HAW Corporation receiving additional moneys.

Technically, HAW Corporation was the holder of the mortgage, and thus had the power to modify it. However, Garfinkle was Levin's agent in the sale of the property, and Breger was Levin's attorney. Both had a fiduciary duty to Levin with respect to any additional proceeds received from the sale. Furthermore, Levin retained a fifty percent share in all of the purchase money mortgages received from the sale of the Charlotte properties, and thus was entitled to share in the fruits of any modification of the mortgages.

Levin's testimony that he was never made aware of the increased proceeds is uncontradicted. Fensterheim admitted on cross-examination that his contention that Levin knew of the modification was no more than an assumption on Fensterheim's part, (T. 1739), and there is no suggestion in the record that the proceeds of the modification were accounted for at the Cobblestones' closing, which occurred shortly thereafter. It is also clear from the record that Levin did not receive any of the $80,-000 in interest paid to Breger at the time of the mortgage modification, because Breger admittedly distributed those funds to Garfinkle, Weissman, and himself. Finding 199. Even if the defendants believed that Levin was not entitled to share in the $30,-000 in prepaid interest paid as consideration for the mortgage modification (on the ground that HAW Corporation's modification was separate from Levin's interest in the mortgages), there is no possible excuse for the failure to pay Levin his share of the $50,000 which was paid to reduce the original mortgage at the time of the modification.

Garfinkle and Breger are plainly liable to Levin. Garfinkle had knowledge of Levin's interest, and also had a fiduciary duty to him under the November 8 agreement. Breger contends that he was unaware of the terms of the November 8 agreement, and thus was unaware that Levin still had an interest in the mortgages at the time of the modification. However, Breger was Levin's counsel in connection with the sale of the Sheffield Farms property, and thus had a duty to protect Levin's interests. Certainly Breger should have asserted a claim that the additional funds paid by the purchasers constituted additional proceeds to which Levin was entitled as seller. Moreover, even if I were to assume that Breger did not know of Levin's share in the mortgages, he was derelict in certifying to the purchasers that Levin no longer had an interest in the transaction without at least checking with Levin. This was so particularly since the original mortgage ran to Levin personally; the purchasers had raised the question of Levin's continued interest; and the checks Breger received at the time of the modification were made payable to Breger "as attorney for Bennett Levin."

Levin also contends that Weissman is liable to him on the ground that he participated in the fraud by receiving a note for the additional $50,000 in proceeds. Weissman was present at the Sheffield Farms' closing when Levin assigned his interest in the mortgage to HAW Corporation. However, there is no evidence that Weissman

knew of Levin's participating share in the mortgages. Although Weissman should have been suspicious of the lack of involvement of Levin, the seller of the property, in the subsequent negotiations, Weissman was under no duty to Levin and thus cannot be faulted for failing to take steps to protect Levin's interests. While Weissman's involvement is certainly questionable, I cannot say, with respect to this transaction, that he knowingly participated in the fraud against Levin.

Accordingly, Levin is entitled to recover from Garfinkle and Breger his one-half share under the November 8 agreement of the $50,000 in additional proceeds, the $30,000 in prepaid interest penalty, and the $50,000 amortization under the original mortgage which Breger distributed to himself, Garfinkle, and Weissman.

### VII. Garfinkle's Performance Under the Hunt Club and Timberline Mortgages

Levin further contends that Garfinkle and Fensterheim are liable to him for nonperformance under the mortgages on the Hunt Club and Timberline properties. After Garfinkle and Fensterheim purchased the properties, they failed to make any payments on the mortgages to Levin, and failed to give him any credit for the payments due under the deed of trust. Findings 186, 191. Levin himself was unable to foreclose on the properties, because the mortgages were held by HAW Corporation.

With respect to the Timberline property, Daryl Greenberg, who managed the Charlotte properties during both Levin and Garfinkle's ownership, testified without contradiction, and I accept the testimony as credible, that Garfinkle told Greenberg that he planned to permit the senior lienholders to foreclose, wiping out junior lienholders, including himself and Levin, after which Garfinkle intended to buy the properties back from the senior lienholders. In addition to this statement of intention, there is objective evidence that Garfinkle deliberately defaulted on the senior mortgages. At the same time that Garfinkle was requiring Greenberg to wire to him substantial amounts of the rent collections from the property, Garfinkle was not making payments on the senior mortgages. Finding 188. Finally, Garfinkle conceded at trial that after Levin complained of the loss of the property he offered Levin a credit of $183,125 as compensation for it. Finding 189.

The evidence is clear that Garfinkle's failure to pay the senior lienholders was deliberate, rather than the result of an inability to make the payments. Even if the failure to pay were not deliberate, however, HAW Corporation should have foreclosed on the corporation which Garfinkle and Fensterheim had established to hold the Timberline property, because of its failure to keep current in its payments on the senior mortgages. The rationale for granting Garfinkle a senior interest in the purchase money mortgages was to permit him to foreclose rapidly on any purchaser whose default threatened Levin and Garfinkle's security interest in the property, and ironically, failure to keep senior liens current was one of the defaults asserted by Garfinkle when he quickly moved to foreclose Levin's interest in the Charlotte properties in October, 1976. Finding 73. Thus, an additional basis for Garfinkle's liability to Levin for the loss of the Timberline property was the failure of HAW Corporation, which is controlled by Garfinkle, to protect Levin's fifty percent interest in the mortgage on the Timberline property.

With respect to the Hunt Club property, Levin never received any payments on the purchase money mortgage, nor did he receive any credit against his indebtedness under the deed of trust. Findings 186, 191. The defendants contend that HAW Corporation did not foreclose against the Garfinkle corporation holding the property because, since Levin's interest in the purchase money mortgage had been wiped out by the October 1977, U.C.C. sale of Levin's interest in that mortgage to HAW Corporation, the mortgagor and mortgagee of the Hunt Club property were the same—Garfinkle—making foreclosure unnecessary.

However, Garfinkle and Fensterheim purchased the Hunt Club property on April 1, 1977. HAW Corporation (Garfinkle's) permitted the corporation holding title to Hunt Club (Garfinkle's), to remain in default for six months, from April until October, 1977. Defendants have offered no excuse for their failure to foreclose on the purchase money mortgage during this period. They have not suggested that Levin relieved them of their obligation to make those payments. Moreover, they cannot rely on Levin's repudiation of his indebtedness under the deed of trust as an excuse for failure to make payments or to foreclose on the purchase money mortgage, as Levin did not renounce his indebtedness until August 1977. Even after Levin repudiated his indebtedness, under the U.C.C. Garfinkle and Fensterheim were under a duty to apply any proceeds from the collateral in their possession—the purchase money mortgages—against Levin's debt, 12A Pa.Stat.Ann. § 9–207(2)(c). Therefore, Levin's repudiation did not relieve them as mortgagors on the purchase money mortgage of the obligation to make payments under those mortgages, or as officers of HAW Corporation of their obligation to protect Levin's share in the mortgages.

### VIII. Interest Payments Received by Defendants After the Sale of the Charlotte Properties

After the sale of the Charlotte properties, Fensterheim received $36,811 on behalf of HAW Corporation in interest payments on the purchase money mortgages, Findings 202–209, and $50,000 was paid to Weissman as a result of an assignment from HAW Corporation. Levin was entitled to one-half of these payments because of his fifty percent share in the mortgages. *Id.* Fensterheim did not pay to Levin his share, nor did he give Levin credit for his indebtedness on account of any of these payments. *Id.*

Fensterheim testified that Garfinkle instructed him not to make further payments to Levin for his share of the mortgages because Levin had repudiated his debt. However, this excuse is inapplicable to at least one of the payments received, because Fensterheim received it more than two weeks before Levin's repudiation. Findings 202–203. Furthermore, although Garfinkle and Fensterheim may have had a legal right to retain Levin's share of the interest payments after he announced his intention not to pay his debt, *see* 12A Pa.Stat.Ann. § 9–207(2)(c), they had a duty to apply Levin's share against his indebtedness, *id.*, which Fensterheim admits was not done. (T. 1783).

Under the U.C.C., since Garfinkle and Fensterheim are liable for losses suffered by Levin caused by their failure to apply the proceeds from the mortgages to his indebtedness, 12A Pa.Stat.Ann. § 9–207(3), they must account to him for these payments.

### IX. Miscellaneous Transactions Between Levin and Garfinkle

Levin and Garfinkle were involved in a number of minor transactions in which Levin expended money on Garfinkle's behalf. Findings 210–221. With respect to several of these payments, in the total amount of $43,400, it was undisputed that Levin made expenditures for Garfinkle's benefit for which he was not compensated by Garfinkle. Findings 211, 212, 213, 214, 216, 217, 220. As noted in the Findings of Fact, Garfinkle contends that these debts were satisfied and released by the January 14, 1977 accounting between Levin and TAFU Corporation. However, on its face, the January 14, 1977 agreement is strictly between Levin and TAFU Corporation: there is no indication that it also encompasses personal obligations between Levin and Garfinkle, and Garfinkle's testimony that he understood the January 14 accounting to encompass his personal debts to Levin is not sufficient to overcome the written document stating that the accounting was between Levin and TAFU Corporation.

Garfinkle also received $10,917 in prepaid laundry rents during Levin's ownership, for which Levin was never given credit. Finding 215. Garfinkle is liable to Levin for this sum, because he personally received the

money, and it is not encompassed in any release.

Levin also contends that Garfinkle is liable to him for money he expended to upgrade computer facilities at Levin's Philadelphia office. Finding 218. Levin himself retains possession of this equipment. Although Garfinkle suggested that he buy it, the decision to do so was Levin's, and Garfinkle received no benefit from Levin's purchase. I see no basis for holding Garfinkle liable. Moreover, the parties discussed the computer equipment when Levin purchased the Charlotte properties in June, 1976, at which time Garfinkle refused to pay for it. Accordingly, the equipment is encompassed in the June 29, 1976 release between the parties.

Levin also contends that he was forced to satisfy a $4,500 debt of Garfinkle's as a condition for doing business with a computer programming company. Levin did not make the payment at Garfinkle's request, but did so on his own initiative, and I cannot hold Garfinkle liable for this payment.

Levin further contends that he made a $21,000 mortgage payment on behalf of Garfinkle in return for Garfinkle's assumption of certain of Levin's obligations. Finding 221. Assuming this to be true, there is no evidence that Garfinkle did not perform any promise he made with respect to this payment, and thus there is no basis for imposing liability upon him for it.

Finally, when Levin negotiated a $200,-000 loan from defendant K. B. Weissman in January, 1977, Garfinkle received $60,000 from the proceeds. Levin alone was named obligor on the note, but Garfinkle agreed to share repayment to Weissman in proportion to his share. Finding 219. Weissman seeks payment of the $200,000 note as a counterclaim in this action. It is not clear from the record how much of Garfinkle's share of the loan has been repaid, but Garfinkle is liable to Levin for whatever amount remains unpaid on Garfinkle's share.

At the time Levin purchased the Charlotte properties from Garfinkle, Garfinkle promised to assume liability for one-half of any losses connected with the Bromley Estates, a New Jersey real estate development. Subsequently, because of Garfinkle's failure to forward payment in settlement of a claim, judgment was entered against Levin in the amount of six million dollars. Findings 222–224. At this time Levin's actual liability as a result of the judgment is uncertain, but if and when Levin must satisfy the judgment, Garfinkle will be liable to Levin for one-half of such amounts as may be necessary to satisfy that obligation.

Garfinkle also promised to indemnify Levin for any liability arising out of work Levin performed at Sutton at Collingswood, another New Jersey property. Finding 225. Levin paid part of one settlement involving this property. However, the record is not clear whether he was forced to do so or voluntarily paid as an accommodation to Garfinkle. Levin further contends that there is ongoing litigation for which he may incur liability. However, since no judgments have been entered as yet, Levin has no grounds for seeking indemnification from Garfinkle.

Finally, Levin also contends that Garfinkle is liable to him for payments Levin made to satisfy the so-called Peck judgment. Findings 228–237. The record is clear, however, that Levin voluntarily agreed to assume a share of the Peck obligation, and that Levin had his own counsel protecting his rights in negotiating settlement of the Peck matter. Neither Garfinkle nor Fensterheim has any liability to Levin because of the Peck judgment.

## X. The Sale of Levin's Interest in the Purchase Money Mortgages

 Levin contends that Garfinkle and Fensterheim's U.C.C. sale of Levin's interest in the purchase money mortgages from the Charlotte properties was wrongful, because they fraudulently failed to make payments and to give him credit to which he was entitled, and because, taking into account the credit due him, his payments were current at the time the sale occurred. Levin seeks to have the sale set aside, and

to have the collateral returned to him, or, in the alternative, an award of damages.

At the time of the sale, Levin's outstanding indebtedness under the deed of trust was $777,935. His interest in the purchase money mortgages totalled approximately $1.7 million, for which HAW Corporation "paid" $500,000 at auction. Findings 161, 167. Unquestionably, when Levin's interest was sold, money was due him, and he had not been given all the credit against his indebtedness to which he was entitled. Summarizing the various Findings of Fact relating to these credits, Levin was entitled to a total credit of $324,942, made up as follows:

$90,000 from renegotiation of the Sheffield Farms mortgage;

$191,537 from the Timberline and Hunt Club mortgages;

$43,405 payments under the purchase money mortgages on the Charlotte properties;

With respect to the above-mentioned $90,000 credit from the renegotiation of the Sheffield Farms mortgage, under the November 8 agreement Levin was entitled to $25,000 credit for Garfinkle's share of the $50,000 additional proceeds. *See* Finding 195. In addition, he did not receive his share of the additional proceeds or of the amortization paid at the time the mortgage was renegotiated. Accordingly, Levin was entitled to credit for his one-half share of the $50,000 additional proceeds; his one-half share of the $30,000 prepaid interest; and his one-half share of the $50,000 amortization on the original purchase money mortgage paid at the time of the modification. *See* Finding 195.

Levin was also entitled to credit for $8,370 in payments from May to October, 1977, which he should have received from Garfinkle and Fensterheim on the Hunt Club mortgage, but did not. Garfinkle had also offered to Levin a credit of $183,167 for the foreclosure on Timberline by the senior lienholders. *See* Findings 183–191.

As to the credit in the amount of $43,405, this represented Levin's one-half share in the interest payments under the purchase

money mortgages from the Charlotte properties received by Fensterheim and Weissman, but not paid to Levin because he repudiated his indebtedness. Findings 202–209.

Levin contends that if he had been given credit for these amounts, he would have been current on all his obligations and would not have been in default at the time of the sale. Even if that be so, since Levin had repudiated his indebtedness under the deed of trust, that in itself was a default. Therefore, even taking into consideration the additional $324,942 credit, Levin was still liable for a balance of $452,993 under the deed of trust. Since I have rejected his contention that he had no liability under the deed of trust because of Garfinkle's failure to give him proper credit at each of the closings, *see* Discussion, Section IV, *supra*, Levin was in default, and Garfinkle was within his rights in resorting to the sale of the collateral.

Accepting, then, that Garfinkle and Fensterheim had the right to sell Levin's interest in the purchase money mortgages, the question is whether the sale complied with the requirements of the Uniform Commercial Code. Levin contends that the sale was commercially unreasonable and instigated in bad faith, in violation of 12A Pa.Stat. Ann. § 9–507. "The principal limitation on the secured party's right to dispose of the collateral is the requirement that he proceed in good faith and in a commercially reasonable manner." *Id.*, Official Comment 1. The Code defines "good faith" as "honesty in fact and in the conduct of the transaction concerned." 12A Pa.Stat.Ann. § 1–201(19). Here, there is substantial merit to Levin's contention that the failure to give him proper credit constituted a breach of good faith. It does not follow, however, that the sale should be set aside. Section 9–507(1) provides that a secured party who disposes of collateral in violation of the Code is liable for "any loss caused by a failure to comply;" it does not authorize totally voiding the sale. In this case, even if Garfinkle and Fensterheim had credited Levin with the moneys due him, he would

nonetheless have remained liable for well over $400,000. It is clear from the record that Levin would have repudiated liability for that amount as well, inasmuch as he has throughout adamantly maintained that he had no liability whatsoever under the deed of trust, and the sale of his interest in the purchase money mortgages would therefore have occurred in any event. Accordingly, the sale of Levin's interest in the purchase money mortgages cannot be attributed to Garfinkle and Fensterheim's failure to give him proper credit.

XI. *Levin's Dealings with K. B. Weissman*

 Levin contends that Weissman is liable to him for fraud in connection with his dealings with Garfinkle and Fensterheim, on the ground that Weissman cooperated with them in defrauding Levin. Although Weissman had numerous dealings with both Garfinkle and Levin, and some of them were certainly questionable, see Findings 194–199, 251–254, Levin has failed to prove that Weissman conspired with Garfinkle and Fensterheim to defraud him in connection with the purchase and sale of the Charlotte properties.

On the other hand, there is undisputed evidence that Weissman failed to give Levin credit for various payments Levin made to Weissman, or Garfinkle made to Weissman on Levin's behalf. Levin is entitled to credit for these payments as an offset against his indebtedness to Weissman under the $200,000 note, which is the subject of Weissman's counterclaim.

Weissman does not dispute Levin's testimony that Levin paid Weissman $24,000 to reimburse Weissman for a mortgage payment which Weissman in fact never made, Findings 239–240; that Levin paid Weissman $10,000 to reimburse Weissman for a bounced check which in fact did not bounce, Findings 243–244; or that Levin paid Weissman $18,000 in September, 1976, for which Weissman never gave Levin credit, Findings 248–249. Likewise, Weissman does not dispute testimony that Garfinkle paid him $10,000 on account of Levin's in-

debtedness in August, 1976, Findings 245–247, or testimony that $10,000 from the loan on the Rondi River property was endorsed back to Weissman on account of Levin's indebtedness. Findings 250–253.

Accordingly, Levin is entitled to a total credit of $72,000 against the $200,000 indebtedness and, therefore, Levin is liable to Weissman for $128,000.

Weissman seeks interest of 2% per month from July, 1977, to the present, on the outstanding balance due him, as well as an attorney's fee for the cost of collection in the amount of 5%. Had Levin wrongfully refused to pay his debt to Weissman when it came due, it is quite likely that Weissman would be entitled to the interest and the attorney's fee specified in the note. The record is clear, however, that Levin refused to pay Weissman only when he became convinced that Weissman was defrauding him. On five separate occasions during the spring and summer of 1977, Levin wrote to Weissman seeking an accounting for payments Levin had made to him. Finding 258. In some instances Levin supplied Weissman with records and ledger sheets in an attempt to facilitate this accounting. Weissman steadfastly refused to render such an accounting, with the result that Levin stopped making payments, and ultimately filed this lawsuit. Although Weissman is entitled to be repaid $128,000, the outstanding balance of Levin's indebtedness after credits due Levin are subtracted, I will only award him interest at the legal rate of 6% until the date of entry of judgment and will deny him a counsel fee because his unexplained failure to render an accounting of the amounts properly due warranted Levin's refusal to make further payments. The 2% per month rate of interest called for in the note will apply on unpaid balances of the loan after the date judgment is entered.

XII. *Levin and Garfinkle's Investment in the Rondi River Property*

Garfinkle and Fensterheim concede that Levin is entitled to a 25% share in the Rondi River property, and that he is entitled to an

accounting with respect to the operation and sale of the property.

From the evidence presented at trial, it is clear that at a minimum Levin is entitled to $31,250 in cash, as his share of the cash proceeds from the sale of the property, and to a $122,859 share in the purchase money mortgages taken back by the Rondi River Realty Corporation at the time of the sale. Finding 278. Levin also paid $33,348 in expenses for the Corporation for which he was never reimbursed, and these must be taken into consideration when Levin is rendered an accounting. Findings 264–269. The evidence also showed that the property had a monthly income of approximately $10,000 during the time it was owned by the Rondi River Realty Corporation, and Levin is entitled to an accounting for his proportionate share of cash distributions during this time. Finding 273. Finally, the evidence showed that Garfinkle pledged the property itself and purchase money mortgages from the sale of the property as collateral for various loans, from which Levin received only $6,000. Findings 274, 277, 279–280. As part of the accounting due Levin, he is entitled to an explanation of how these transactions affected his interest in the property itself, or the purchase money mortgages taken back at the time of the sale, and he is entitled to damages to the extent that these transactions adversely affected his interest.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties under 28 U.S.C. § 1332.

2. Consideration of Levin's testimony about alleged oral promises and agreements in connection with the purchase of the Charlotte properties is barred by the parol evidence rule.

3. Levin was not fraudulently induced to purchase the Charlotte properties.

4. Levin settled numerous claims with Garfinkle prior to and as part of his agreement to purchase the Charlotte properties on June 29, 1976.

5. After purchasing the Charlotte properties, Levin learned of misrepresentations by Garfinkle relative to the purchase. He nonetheless ratified the agreement to purchase the Charlotte properties on November 8, 1976, at the time he entered into the agreement to sell them.

6. Levin was not under duress at the time he signed the agreement to sell the Charlotte properties.

7. Consideration of Levin's testimony about alleged oral promises and agreements in connection with the November 8 agreement to sell and the "estoppel letter" is barred by the parol evidence rule.

8. On January 14, 1977, the parties entered into a modification of the November 8 agreement. Levin was not under duress at the time he signed it.

9. The parol evidence rule does not bar consideration of evidence contradicting the "account stated" letters executed after each sale of the Charlotte properties. The letters are nonetheless conclusive against Levin, because he has not carried his burden of establishing by clear and convincing evidence that the letters should be set aside because of fraud and mistake.

10. Levin is not entitled to recover for fraud with respect to the account stated letters under a tort theory or under federal or state securities laws.

11. Garfinkle is liable to Levin for damages for breach of fiduciary duty with respect to Garfinkle's refusal of the wraparound mortgage offered by the purchasers of the Chatham Square property. The measure of damages is the market value of the wraparound mortgage on the date it would have been offered to Levin.

12. Garfinkle, Fensterheim and Breger are liable to Levin for $65,000 in connection with the renegotiation of the Sheffield Farms mortgage, representing Levin's share of the increased indebtedness and of the amortization paid at the time of the renegotiation.

13. Garfinkle and Fensterheim are liable to Levin for $5,580 under the Hunt Club purchase money mortgage, for failure to

make monthly payments from May to August, 1977, and for breach of fiduciary duty in failing to foreclose on the mortgage in order to protect Levin's interest.

14. Garfinkle and Fensterheim are liable to Levin for $183,167, for breach of fiduciary duty in allowing senior lienholders to foreclose on the Timberline property.

15. Garfinkle and Fensterheim are liable to Levin for $1,127, Levin's one-half share of the interest payment under the purchase money mortgages received by Fensterheim before Levin repudiated his indebtedness under the deed of trust.

16. Levin is entitled to an accounting from Garfinkle and Fensterheim for a one-half share of the interest payments under the purchase money mortgages received by Fensterheim after Levin repudiated his indebtedness.

17. Garfinkle is liable to Levin for $43,-400 as reimbursement for various payments Levin made on Garfinkle's personal behalf. Garfinkle is liable to Levin for $10,917 laundry rent received by Garfinkle during Levin's ownership of the Charlotte properties.

18. Garfinkle is liable to Levin for the outstanding balance of Garfinkle's $60,000 share in Levin's indebtedness to Weissman.

19. Garfinkle is liable to Levin for one-half of all amounts Levin will be required to pay on account of the judgment entered against Levin with respect to the Bromley Estates property in New Jersey.

20. Garfinkle and Fensterheim have no liability to Levin for the auction under the Uniform Commercial Code of Levin's interest in the purchase money mortgages pledged as collateral under the deed of trust.

21. Levin is liable to K. B. Weissman in the amount of $128,000 with six percent interest from the time of Levin's last payment to Weissman until the entry of judgment herein. Weissman is not entitled to attorneys' fees incurred in attempting to collect from Levin.

22. Levin is entitled to an accounting from Garfinkle and Fensterheim for the operation and sale of the Rondi River property, and to have considered in such accounting such sums as Levin has expended on behalf of the Rondi River Realty Corporation.

23. Levin is entitled to judgment as follows:

a. Against Garfinkle, Fensterheim, and Breger:

$ 65,000 – renegotiation of the Sheffield Farms mortgage;

b. Against Garfinkle and Fensterheim:

$ 5,580 – Hunt Club payments (May–August, 1977)
 183,167 – loss of the Timberline property
 1,127 – one-half share of interest before repudiation
$189,874

c. Against Garfinkle:

$ 43,400 – personal obligations
 10,917 – laundry rent received by Garfinkle.
$ 54,317

In summary, Levin is entitled to judgment in the total amount of $309,191, of which $65,000 is against Garfinkle, Fensterheim and Breger jointly; $189,874 is against Garfinkle and Fensterheim jointly; and $54,317 is against Garfinkle alone.

24. Levin is entitled to judgment against Garfinkle for the following items with respect to which further evidence is necessary before a specific amount of damages can be assessed:

—the market value of the wraparound mortgage on the date it should have been offered to Levin

—the balance outstanding on Garfinkle's $60,000 share in Levin's indebtedness to Weissman.

25. Levin is entitled to judgment declaring Garfinkle liable for one-half of all payments which Levin may in the future be required to pay on account of the Bromley Estates property.

26. Garfinkle and Fensterheim will be ordered to render an accounting to Levin for the following:

the operation and sale of the Rondi River property;

the interest payments they received under the purchase money mortgages after Levin repudiated his indebtedness.

27. Weissman is entitled to judgment against Levin for $128,000, at six percent interest from the time of Levin's last payment to Weissman until the date of entry of judgment. Thereafter Weissman is entitled to interest at the rate of 2% per month on the unpaid balances of the $200,000 indebtedness.

In view of the need for further hearing or submission of evidence as to the damages assessable for the items set forth in Conclusion of Law No. 24, entry of judgment herein will be deferred until after such hearing or submission of evidence.